**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| REYNOLDS CONSUMER PRODUCTS LLC; and SOUTHWIRE COMPANY, LLC,<br><br>   Plaintiffs,<br><br> v.<br><br>GLENCORE AG; GLENCORE, LTD.; GOLDMAN SACHS & CO.; GOLDMAN SACHS INTERNATIONAL; HENRY BATH LLC; J. ARON & COMPANY; JPMORGAN CHASE BANK, N.A.; JP MORGAN SECURITIES PLC; METRO INTERNATIONAL TRADE SERVICES, LLC; MITSI HOLDINGS LLC; ACCESS WORLD (USA) LLC; and PACORINI VLISSINGEN BV.<br><br>   Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

21965656.7

# Table of Contents

INTRODUCTION ................................................................................................5

PARTIES ..........................................................................................................8

VENUE AND JURISDICTION ..........................................................................13

FACTUAL ALLEGATIONS ...............................................................................14

THE ALUMINUM MARKET ..............................................................................14

    Properties & Uses ......................................................................................14

    Aluminum Production.................................................................................14

    Aluminum Supply And Demand .................................................................16

    Relevant Aluminum Market For Purposes Of Complaint ..................................17

ALUMINUM PRICING .....................................................................................18

    The Price Of Aluminum Is Determined By The LME Cash Price And The Applicable Regional Premium. ......................................................................18

THE LME WAREHOUSE MARKET ..................................................................20

    LME-Certified Warehouses ........................................................................20

    Relevant LME Warehouse Market For Purposes Of The Complaint ................22

DEFENDANTS CONSPIRE TO ARTIFICIALLY INFLATE THE MIDWEST PREMIUM.....................................................................................................23

    Banks And Traders Take Control Of The Aluminum Market By Acquiring LME Warehouses. ............................................................................................23

    Defendants Conspire To Restrict Aluminum Supply And Drive Up Prices.....................24

        *Defendants Violate The LME Information Barrier And Work Together To Carry Out The Conspiracy.*.....................................................................25

        *Defendants Agree Not To Compete With One Another.* ........................................27

        *Defendants Stockpile Aluminum To Create Excessively Long Queues.* ................28

            Defendants work around load out rules to minimize the amount of aluminum leaving their warehouses...........................................................28

Defendants offer incentive payments to attract more metal to warehouses with long queues.................................................................30

Defendants work together to strategically cancel warrants and favor each other with preferential treatment. ................................................32

Defendants shuffle inventory between warehouses and work together to prevent aluminum from becoming available. ..........................37

DEFENDANTS CAUSE THE MIDWEST PREMIUM TO RISE AND REAP INCREASED TRADING PROFITS AND STORAGE FEES......................................40

Queues Rise Dramatically As The Amount Of Aluminum Stored In LME Warehouses Soars. ..........................................................40

The Shortage Of Available Spot Aluminum Causes The Midwest Premium To Dramatically Rise...............................................................42

Defendants Benefited From Their Conspiracy Through Increased Trading Profits And Increased Storage Revenues......................................43

*Banks And Trader Defendants Profited From Physical Sales And From Trading.*..................................................................43

*Defendants' Warehousing Operations Increased Storage Profits*........................47

Defendants Exit The Market Upon Investigatory Scrutiny. ................................47

PLAINTIFFS SUFFERED INJURY RESULTING FROM DEFENDANTS' CONSPIRACY. .......................................................................50

CLAIMS FOR RELIEF ......................................................................51

FIRST CLAIM FOR RELIEF
VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 ..................................51

SECOND CLAIM FOR RELIEF
VIOLATION OF THE NEW YORK DONNELLY ACT ..........................................53

THIRD CLAIM FOR RELIEF
VIOLATION OF THE MICHIGAN ANTITRUST REFORMATION ACT ..............................54

FOURTH CLAIM FOR RELIEF VIOLATION OF THE ILLINOIS ANTITRUST ACT (BROUGHT BY REYNOLDS ONLY)..........................................................55

FIFTH CLAIM FOR RELIEF UNJUST ENRICHMENT (BROUGHT BY REYNOLDS ONLY)..........................................................57

SIXTH CLAIM FOR RELIEF

VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
(BROUGHT BY SOUTHWIRE ONLY) .......................................................................57

SEVENTH CLAIM FOR RELIEF UNJUST ENRICHMENT
(BROUGHT BY SOUTHWIRE ONLY) .......................................................................59

REQUEST FOR RELIEF ...............................................................................................60

DEMAND FOR JURY TRIAL .......................................................................................61

Plaintiffs Southwire Company, LLC ("Southwire") and Reynolds Consumer Products LLC ("Reynolds") for their Complaint against Defendants, with knowledge as to their own actions and events, and upon information and belief as to other matters, allege as follows:[1]

## INTRODUCTION

1.      This case arises out of Defendants' blatant, well-documented conspiracy to artificially increase aluminum prices in violation of federal and state law. Defendants, a combination of financial institutions, commodities traders, and aluminum warehouse operators, conspired to artificially manipulate and drive up the standard aluminum pricing components used throughout the industry. Plaintiffs Southwire and Reynolds are large manufacturers of products that require enormous amounts of primary aluminum and that, combined, purchased over *1 million metric tons* of aluminum between 2011 and 2014—including from Defendants Glencore, Ltd. and J. Aron & Company. Southwire and Reynolds thus suffered substantial injury from Defendants' improper and illegal market manipulation.

2.      Southwire is North America's leading manufacturer of wire and cable used in the distribution and transmission of electricity. One in three new homes built in the United States uses Southwire wire. Southwire produces half of the cable used to transmit and distribute electricity throughout the United States. Southwire's wire also plays a key role in the manufacturing of other products, from automotive wiring harnesses to electrical motors to mining cable to insect screening.

_____

[1] Plaintiffs' information and belief is based on their analysis of: (1) court documents filed or otherwise made public in current antitrust litigation against Defendants; (2) the 2014 Senate Subcommittee on Investigations report on Wall Street Bank Involvement with Physical Commodities (the "Senate Report", cited to herein as "S.R."); (3) publicly available news and media articles and investigations; and (4) other sources. Plaintiffs currently lack access to all the underlying facts relating to Defendants' improper activities because much of that information lies exclusively within the possession, custody, or control of Defendants and other insiders. Plaintiffs believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

3.      Reynolds is the owner of some of America's most trusted household product brands. The Reynolds line of products includes Reynolds Wrap® brand aluminum foil, private label rolled aluminum foil, and disposable aluminum bakeware.

4.      Southwire and Reynolds require primary aluminum to manufacture their respective products and procure it through long-term contracts with aluminum producers and traders. Southwire has purchased primary aluminum from, among others, Defendants Glencore, Ltd. and J. Aron & Company. Reynolds has purchased primary aluminum from Defendant Glencore, Ltd.

5.      Southwire's and Reynold's primary aluminum contracts use pricing terms comprised of two primary, industry-standard elements: an amount known as the "LME Cash Price," plus an additional amount referred to as the "Platts' Midwest Premium." Because the LME Cash Price and the Platts' Midwest Premium are standard non-negotiable pricing components in the aluminum industry, Southwire and Reynolds are unable to reasonably procure primary aluminum in the United States that is not priced in this manner.

6.      Defendants consist of two groups: (1) financial institutions with commodities trading arms that trade financial instruments tied to aluminum; and (2) operators of aluminum warehouses. Working together, these entities engaged in a conspiracy to increase the financial institutions' commodities trading profits and the warehouse companies' revenues by artificially manipulating the supply of available primary aluminum in key locations they controlled.

7.      Shortly after acquiring control of the relevant aluminum warehousing network, Defendants and their co-conspirators began engaging in a series of concerted actions designed to artificially drive up the standardized regional premiums applicable to primary aluminum pricing and to reap increased profits, all at the expense of Plaintiffs and other consumers.

8.      Defendants carried out their nefarious scheme through a series of concerted acts that included, but were not limited to: (1) agreeing to, and actually, not competing with each other; (2) agreeing to, and actually, violating information barrier requirements; (3) agreeing to, and actually, stockpiling primary aluminum in key aluminum warehouses that they controlled; and (4) agreeing to, and actually, creating excessively long queues to unload physical aluminum. These actions had the effect of reducing the amount of available aluminum on the spot market and driving up the standardized premiums on aluminum. Defendants benefited from their conspiracy through increased warehouse storage rents and increased trading profits on aluminum-related contracts in the commodities market.

9.      Defendants' conspiracy involved a complex web of participation by both banks and affiliated warehouses, and crossed the boundaries of both horizontal and vertical affiliations. Banks conspired with other banks, warehouses conspired with other warehouses, and banks and warehouses conspired together, all in an effort to improperly and illegally raise prices beyond competitive levels.

10.     Southwire and Reynolds are the real world users whose demand for aluminum creates the market for aluminum sales; thus, were it not for their (and other similarly situated purchasers) need to use aluminum as an input in their production processes, it would not be possible for the financial trading defendants to trade aluminum as a commodity. Real world aluminum users such as Southwire and Reynolds are the fulcrum to the creation of the market opportunity underlying both metal storage and warrant trading for aluminum. As the real world buyers who must pay prices for primary aluminum that incorporate the standardized aluminum premiums, they necessarily are impacted directly by the alleged misconduct, and their purchases

are inextricably intertwined with the competitive landscape in which Defendants' scheme played out.

11.     Defendants' conspiracy caused Southwire, Reynolds, and other aluminum users to pay millions of dollars in artificially inflated prices to acquire aluminum for their production needs. Between 2011 and 2014 alone, Southwire purchased over 650,000 metric tons ("MT") of aluminum at illegally inflated prices due to Defendants' misconduct. Over the same time period, Reynolds purchased over 380,000 MT of aluminum at anticompetitive prices.

12.     Southwire and Reynolds bring this action to recover damages for injuries they sustained as a result of Defendants' violations of federal and state law.

## PARTIES

13.     **Southwire:** Southwire Company, LLC is North America's leading manufacturer of wire and cable used in the distribution and transmission of electricity. The company's headquarters are located at One Southwire Drive, Carrollton, Georgia 30119.

14.     **Reynolds:** Reynolds Consumer Products LLC is the owner of some of America's most trusted household products brands. The Reynolds line of products includes Reynolds Wrap® brand aluminum foil and Hefty® brand trash bags and disposable tableware. The company's headquarters are located at 1900 West Field Court, Lake Forest, Illinois 60045.

15.     **Goldman Sachs & Co.:** Defendant Goldman Sachs & Co. ("Goldman" or "Goldman Sachs") is an international financial company headquartered at 200 West Street, #200, New York, New York 10282. Goldman Sachs is a wholly owned subsidiary of The Goldman Sachs Group, Inc. Goldman Sachs & Co. traded aluminum and other base metals for itself as a principal and for its clients, including by trading in a variety of derivative products that derive their value from the underlying asset prices of aluminum.

16.     **Goldman Sachs International:** Defendant Goldman Sachs International is an international financial services provider headquartered at Peterborough Court, 133 Fleet Street, London, EC4A 2BB, United Kingdom. According to regulatory filings with the Securities and Exchange Commission, Goldman Sachs International is a "significant subsidiary" of The Goldman Sachs Group, Inc., meaning that The Goldman Sachs Group, Inc. owns at least 99 percent of the voting securities of Goldman Sachs International. Goldman Sachs International conducts substantial and ongoing business in this District in its own right by virtue of its control and direction of the commodities trading desk of The Goldman Sachs Group in New York. Attendant to this business, Goldman Sachs International is also a registered swap dealer with the Commodities Futures Trading Commission ("CFTC").

17.     **J. Aron & Company:** Defendant J. Aron & Company ("J. Aron") is a New York company, commodities trading firm, and wholly owned subsidiary of The Goldman Sachs Group, Inc., with its principal place of business located at 200 West Street, New York, New York 10282, and additional offices in London and elsewhere around the world.

18.     Goldman Sachs & Co., Goldman Sachs International, and J. Aron collectively undertook the business of physical and derivative metal trading for the Goldman family, such that for purposes of pleading they should be viewed as one entity.

19.     **Metro International Trade Services LLC:** Defendant Metro International Trade Services LLC ("Metro") is a limited liability company organized under the laws of Michigan and headquartered at 2500 Enterprise Drive, Allen Park, MI, 48101.

20.     **MITSI Holdings LLC:** Mitsi Holdings LLC is a Delaware limited liability company and wholly-owned subsidiary of The Goldman Sachs Group, Inc. with its principal place of business located at 200 West Street, 29th Floor, New York, NY 10282. Mitsi Holdings

LLC is the parent holding company of, with 100% ownership interest in, Defendant Metro International Trade Services LLC.

21.     **JPMorgan Chase Bank, N.A.:** Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") is a federally-chartered national banking association headquartered at 270 Park Avenue, New York, New York 10017, and a wholly-owned subsidiary of JPMorgan Chase & Co. JPMorgan conducts business within this District and owned billions of dollars in aluminum that was stored in warehouses during the relevant period.

22.     **JPMorgan Securities plc:** Defendant JPMorgan Securities plc ("JPMorgan Securities") provides securities brokerage services for JPMorgan, and is headquartered at 25 Bank Street, Canary Wharf, London E14 5JP, United Kingdom. Formerly JPMorgan Securities Ltd., JPMorgan Securities is one of the firm's "principal operating subsidiaries" according to SEC filings, and is a wholly owned subsidiary of JPMorgan. JPMorgan Securities engaged in aluminum transactions on behalf of itself and as an agent of JPMorgan, such that for purposes of pleading they should be viewed as one entity.

23.     **Henry Bath LLC:** Defendant Henry Bath LLC ("Henry Bath") is a limited liability company organized under the laws of Delaware and headquartered at 2500-A Broening Highway, Baltimore, Maryland 21224, and is a subsidiary of Henry Bath & Son, Ltd., a corporation organized under the laws of, and headquartered in, the United Kingdom. Henry Bath owns and operates numerous aluminum warehouses in the United States, including in Chicago, Illinois; Baltimore, Maryland; and New Orleans, Louisiana.

24.     **Glencore, Ltd.:** Defendant Glencore, Ltd. ("Glencore") is a wholly owned subsidiary of Glencore plc (f/k/a Glencore Xstrata, plc), located at 301 Tresser Boulevard, Stamford, Connecticut 06901. Glencore Ltd. is an active trader of aluminum and sells large

quantities of physical aluminum directly to large industrial users in the United States, including both Reynolds and Southwire. Glencore Ltd.'s U.S. traders conferred with traders for Glencore International AG or Glencore AG on certain deals.

25.     **Glencore International AG:** Glencore Inernational AG is a Swiss corporation with a business address at Baarermattstrasse 3, CH-6341 Baar, Zug Switzerland, and is a wholly-owned subsidiary and the primary operating company of Glencore plc (f/k/a Glencore Xstrata, plc). Glencore International AG's employees and agents regularly communicated with the employees and agents of the other Defendants, including Goldman Sachs, Metro, JPMorgan, Henry Bath, and Pacorini, concerning the storage of aluminum and the cancellation of aluminum warrants in the United States and Europe during the relevant period. Glencore International AG owned substantial quantities of aluminum that was stored in warehouses, including those owned by Metro, Pacorini, and Henry Bath. Glencore International AG transacted business in the United States both on its own and via Glencore, Ltd. during the relevant period.

26.     **Glencore AG:** Glencore AG is a Swiss corporation with a business address at Baarermattstrasse 3, CH-6341 Baar, Zug Switzerland, and is a wholly-owned subsidiary of Glencore International AG. Glencore AG's employees and agents regularly communicated with the employees and agents of the other Defendants, including Goldman Sachs, Metro, JPMorgan, Henry Bath, and Pacorini, concerning the storage of aluminum and the cancellation of aluminum warrants in the United States and Europe during the relevant period. Glencore AG is the largest shareholder of Century Aluminum Company ("Century Aluminum"), one of the largest aluminum producers in the United States. It exercises significant control over Century Aluminum, occupying three seats on its board of directors, supplying the plant with alumina, and purchasing aluminum produced by the refinery. Southwire purchased substantial amounts of

aluminum from Century Aluminum. Glencore AG also owns Allied Alumina Inc. (Sherwin Alumina) in Texas. Glencore AG owned substantial quantities of aluminum that was stored in warehouses, including those owned by Metro, Pacorini, and Henry Bath. Glencore AG transacted business in the United States both on its own and in conjunction with Glencore International AG and Glencore Ltd.

27.     **Access World (USA) LLC (f/k/a Pacorini Metals USA LLC):** Defendant Access World (USA) LLC is a limited liability company organized under the laws of Louisiana and domiciled at 520 Elmwood Park Boulevard, Suite 135, Jefferson, Louisiana 70123. Access World (USA) LLC was formerly known as Pacorini Metals USA, LLC and changed its name as of May 16, 2016. Access World (USA) LLC f/k/a Pacorini Metals USA LLC is referred to herein as "Pacorini." Pacorini owns and operates aluminum warehouses in the United States, including in Detroit, Michigan; Baltimore, Maryland; Chicago, Illinois; Los Angeles, California; Mobile, Alabama; and New Orleans, Louisiana.

28.     **Pacorini Vlissingen BV:** Defendant Pacorini Vlissingen BV ("Pacorini BV") is a private limited liability company organized under the laws of the Kingdom of the Netherlands and headquartered at Engelandweg 55 Port No. 1199 4389 PC, Vlissingen-Oost, Netherlands. It owns and operates LME-certified warehouses in Vlissingen, Netherlands that store aluminum.

29.     Pacorini and Pacorini BV are owned and controlled by Pacorini Metals AG ("Pacorini AG"). Pacorini AG is an entity organized under the laws of Switzerland with its principal place of business in Zug, Switzerland. Pacorini AG is owned and controlled by Glencore. One or more affiliates of Glencore International, Glencore AG, and Glencore Ltd. have been the owner of Pacorini USA, Pacorini AG, and Pacorini BV. Through this collective ownership, Glencore International AG, Glencore AG, and Glencore Ltd. exercised control over

Pacorini's operations and collectively undertook the business of physical and derivative metal trading for the Glencore family, such that for purposes of pleading, they should be viewed as one entity.

## VENUE AND JURISDICTION

30.     This action is instituted against Defendants under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1337, Sections 4 and 16 of the Clayton Act, and 15 U.S.C. §§ 15(a) and 26.

31.     This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

32.     This Court has personal jurisdiction over each of the Defendants by virtue of their business activities in this State and by virtue of Defendants' participation in the conspiracy described herein. At all times material to this Complaint, Defendants resided in, transacted business in, and/or committed acts in furtherance of the illegal conspiracy, within this state. Those acts are attributable to all co-conspirators, as described herein. Further, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in this State, including injury to Plaintiffs.

33.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c) and (d), because, at all times material to this Complaint, each Defendant resided, transacted business, or could be found in this District. The activities of the Defendants and their co-conspirators, as described herein, were

within the flow of, were intended to, and did have, direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## FACTUAL ALLEGATIONS

**THE ALUMINUM MARKET**

### Properties & Uses

34.     Aluminum is the most abundant metal found on Earth. It accounts for over eight percent of the Earth's crust. Because aluminum is highly reactive, it does not exist in the environment in its free form.

35.     Aluminum is lightweight, strong, corrosion-resistant, conductive, and durable. Its unique properties result in its use in the manufacture of a wide array of products, such as vehicles, packaging materials, construction materials, and consumer products. Because of its unique properties, there are few readily available substitutes for aluminum in most industrial applications.

36.     Southwire uses aluminum to manufacture a wide range of products including building wire and cable, electrical transmission cable, and other types of wiring and cable. Because of aluminum's unique physical properties, Southwire has no reasonably available substitutes that it can use to produce its products.

37.     Reynolds uses aluminum to manufacture a wide range of products including Reynolds Wrap® brand aluminum foil, private label rolled aluminum foil, and disposable aluminum bakeware. Because of aluminum's unique physical properties, Reynolds has no reasonably available substitutes that it can use to produce its products.

### Aluminum Production

38.     Primary aluminum refers to the process by which new aluminum is made from the mining of bauxite ore. Bauxite ore is refined to extract alumina. Alumina is then shipped to a

primary aluminum plant (or smelter) where aluminum is extracted from the alumina. Molten aluminum can then be alloyed and cast into various shapes, such as ingots, billets, sows, sheets, rolls, and other forms.

39.     Primary aluminum producers generally sell aluminum either to (1) industrial users, who use or fabricate the aluminum into other products; or (2) physical commodities traders and financial buyers, who typically keep aluminum stored in warehouses where it can be traded or re-sold. Thus, the aluminum market consists of several classes of actors who participate in varying ways. Aluminum producers, such as Alcoa, Inc. and Rio Tinto Alcan, Inc., produce and sell aluminum. Industrial users, such as Southwire and Reynolds, purchase aluminum for their own commercial purposes. Physical commodities traders, such as Defendants Goldman, JPMorgan, and Glencore, purchase aluminum so that they can trade financial instruments tied to physical aluminum stored in warehouses. Finally, aluminum warehouse operators, such as Defendants Metro and Henry Bath, receive, store, and ship physical aluminum.

40.     Aluminum stored in warehouses usually consists of a primary aluminum product referred to as P1020 aluminum, which is 99.7 percent pure aluminum cast as standard ingots, t-bars, or sows, which can be readily re-melted and fabricated into other forms of aluminum. P1020 is tradable commodity grade aluminum and is the grade upon which all other aluminum is priced.

41.     Southwire purchases molten aluminum directly from integrated producers such as Century Aluminum. Southwire also purchases solid aluminum, typically in sow or T-Bar form, directly from integrated producers and traders, including Defendants J. Aron and Glencore.

42.     Reynolds purchases aluminum in various forms, including sow and t-bar form, directly from integrated producers and physical traders, including Defendant Glencore.

**Aluminum Supply And Demand**

43.     The demand for aluminum is generally inelastic.[2] This lack of sensitivity to price

for many manufacturers is due to numerous factors, including the fact that, in many products

(such as those made by Southwire and Reynolds), there simply is no substitute whatsoever for

aluminum, while in other products, their specifications and design do not easily allow for

substitution of materials absent a major, cost-prohibitive redesign. As prices change,

manufacturers such as Southwire and Reynolds who use aluminum will not substitute away from

it enough to eliminate the profit opportunity achieved by raising the price. From the demand

side, an increase in price, if achievable, will increase profits to those with aluminum to sell.

44.     The aluminum market adjusts slowly because of the very long lead times required

to add aluminum production capacity. Economists at the Department of Justice ("DOJ")

determined that it takes approximately six years for the aluminum industry to respond to shocks

that would call for a restructure of the industry. The production of aluminum is inelastic over a

span of six or more years because aluminum producers tend to maintain active smelters running

at high capacity, and because it takes about six years to bring a new aluminum smelter on-line.[3]

In many cases, shutdown and startup costs are large, making the decision to keep a smelter

running a function of not only the cost of the inputs directly attributable to output, but also of the

costs required to stop production and potentially restart.

45.     This inelasticity means that price changes in the market due to demand shifts will

have relatively little effect on the volume of aluminum produced. Further, any change in the

---

[2] Christopher L. Gilbert, Modeling Market Fundamentals: *A Model of the Aluminum Market*, Journal of Applied Econometrics Vol. 10, pp. 385-410 (1995).

[3] Luke Froeb and J. Geweke, *Long Run Competition in the Post-War U.S. Aluminum Industry*, INTERNATIONAL JOURNAL OF INDUSTRIAL ORGANIZATION, 5, p. 77 (1987).

amount of aluminum available to the market will cause a large change in price as consumers have a low long-run elasticity, and the supply elasticity takes six or more years to achieve.

46.     Another source of aluminum besides foundries is "secondary aluminum," which is made from aluminum scrap. This source of aluminum is also known to be highly inelastic as it is produced from the left-over portions of aluminum of manufactured products that use aluminum. The volume in the scrap market is, therefore, more a function of the amount of aluminum used in manufacturing than the price of aluminum.[4]

**Relevant Aluminum Market For Purposes Of Complaint**

47.     As alleged above, aluminum has unique properties coveted by manufacturers of products containing aluminum, including Southwire and Reynolds. The aluminum products manufactured by Southwire, Reynolds, and other similarly situated manufacturers have specifications that do not reasonably allow for a change of materials. Thus, aluminum exhibits demand inelasticity. A small but significant increase in the price of aluminum does not lead to substitution. Based on these factors, Plaintiffs allege that the market for primary aluminum can be considered a relevant product market.

48.     The relevant geographic market is the United States and Canada. The vast majority of primary aluminum purchased in the United States is either produced domestically or imported from Canada. The origin of primary aluminum imports into the United States is determined by relative transport costs to alternative destinations. Thus, due to transport costs, duties, and tariffs, primary aluminum purchasers in the United States turn to suppliers in the United States and Canada to meet their demand.

---

[4] Jerry Blomberg, *Essays on the Economics of the Aluminum Industry*, p. 24, Lueå University of Technology, 2007.

**ALUMINUM PRICING**

> **The Price Of Aluminum Is Determined By The LME Cash Price And The Applicable Regional Premium.**

49.     The London Metal Exchange Ltd. ("LME") is the world's largest non-ferrous metals market and a private trade association. More than 80 percent of all global non-ferrous metal futures business is transacted through its trading platforms. The vast majority of aluminum trading activity on the LME takes place among banks, hedge funds, and traders, rather than actual users of aluminum.

50.     The LME determines a daily cash price (the "LME Cash Price") for spot aluminum through open outcry by the marginal buyer and seller at a specific moment in time using standardized LME contracts covering spot material located in LME-certified warehouses. The LME thus provides a price discovery mechanism for a standard aluminum exchange contract throughout the world. While the LME Cash Price is a global price, it does not include transportation and delivery costs.

51.     Contracts for the supply of physical aluminum invariably incorporate an applicable regional premium. These regional premiums are determined based on physical spot deals as well as a daily survey of bids and offers from buyers and sellers. These regional premiums reflect current offers for aluminum available immediately for delivery from producers, traders, and holders of warehoused aluminum, and incorporate the fluctuating transportation, delivery, storage, finance, and insurance costs incurred by these competing suppliers of aluminum. The regional premiums are published by private companies, including Platts and Metal Bulletin.

52.     In the United States, the benchmark regional premium is referred to as the Platts' Midwest Premium (the "Midwest Premium"). Notwithstanding the limitation implied by its

name, the Midwest Premium is charged throughout the United States (and sometimes abroad). The Midwest Premium "incorporates supply and demand of the North American-specific market to complement the LME aluminum contract."[5] Together, the LME Cash Price and the Midwest Premium are referred to as the "Midwest Transaction Price," or "all-in" price, for physical delivery of primary aluminum.

53. There are other premiums, including the Rotterdam Premium (applied primarily in Europe) and CIF Japan Premium (applied primarily in Japan and other parts of the Far East). However, because industrial contracts for physical delivery of aluminum express the price using the LME Cash Price, which is a global price, regional premiums tend to move up and down together. If they did not, multinational aluminum purchasers, traders, and arbitrageurs could exploit pricing differences among regional premiums.

54. Industrial users such as Southwire and Reynolds purchase the vast majority of their aluminum pursuant to long-term supply arrangements rather than on the spot market. However, the pricing of aluminum for long-term industrial supply contracts, such as those that Southwire and Reynolds enter into, is dependent on the supply and demand in the aluminum warehouses, as well as the immediate availability of aluminum for delivery. As the LME has stated, "[a]lthough the physical metal will never pass through the LME network or LME warehouses, the balance of trade does impact LME volumes and prices through the hedge which will likely be transacted by the counterparties to hedge their LME price risk."[6] Thus, long term,

---

[5] Investor Relations, CME Group, http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID= 784335 (last visited June 23, 2016, 11:37AM).

[6] Summary Public Report of the LME Warehousing Consultation at 36 (Nov. 2013), *available at* https://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/Public%20Report%20of%20the%20LME%20Warehousing%20Consultation.pdf

the price Southwire and Reynolds pay for aluminum is inextricably intertwined with the price of aluminum in the LME and on the spot market.

55.     Accordingly, during all times material to this Complaint, Southwire and Reynolds purchased their primary aluminum pursuant to supply contracts that expressly incorporated the LME Cash Price and the Midwest Premium as pricing elements. Southwire and Reynolds could not reasonably procure primary aluminum from suppliers, whether on a spot or yearly basis, without paying the Midwest Premium.

**THE LME WAREHOUSE MARKET**

**LME-Certified Warehouses**

56.     The LME certifies and purports to supervise a global network of more than 700 warehouses for the storage of metals. The LME authorizes warehouse companies and the warehouses they operate to store LME-registered brands of metal, on behalf of warrant holders, and issue LME warrants through their London agent for material delivered into their approved warehouses. The LME describes these locations as "areas of net consumption and logistical hubs for the transportation of material."[7]

57.     Defendants Metro, Henry Bath, and Pacorini collectively own and operate more than 80% of the LME-certified warehouses in the United States and throughout the world. In the United States, Metro operates LME-certified warehouses in Detroit, Toledo, Chicago, Mobile, and New Orleans. Pacorini operates in Detroit, Baltimore, Chicago, New Orleans, Mobile, and Los Angeles. Henry Bath operates in Baltimore, Chicago, and New Orleans.

---

[7] *Warehousing and Brands*, LME.Com, https://www.lme.com/en-gb/trading/warehousing-and-brands/ (last visited June 23, 2016, 11:43 AM).

58.     Upon delivery of a lot of aluminum into an LME warehouse, the warehouse issues an LME warrant, which is a standardized document indicating who has the right to possess that lot of aluminum. LME warrants are freely tradable and are the actual instrument that underpins a highly leveraged volume of LME paper futures transactions. The LME warrant is considered first-class collateral. The holder of an LME warrant can borrow money secured by that warrant on favorable terms. Thus, LME warrants allow persons to convert aluminum into tradable warrants exchangeable for cash or deliverable against trading positions.

59.     Under LME futures contracts, delivery of a warrant represents delivery of the corresponding quantity of physical aluminum. When, at their expiration, forward contract or futures contract prices move into line with the prices for the physical commodity, it is referred to as "convergence."

60.     The LME-certified warehouses are a critical part of the supply chain for aluminum in the United States (and globally) because, among other things, it is only in such warehouses that LME warrants can be issued and canceled. Thus, the LME-certified warehouse market functions on a global basis with distinct regions in North America, Europe, and Asia.

61.     LME warehouses are vital links in the physical supply chain for another reason. During a deficit aluminum market, they represent the supplier of last resort for consumers who need to obtain physical aluminum; during a surplus aluminum market, as during the times material to this Complaint, they represent the destination of last resort for primary aluminum producers who need to keep their plants operating and raise cash.

62.     In this and other ways, the price-neutral, last-resort conduct of the LME warehouses achieved price convergence and made the LME forward contracts attractive both to industrial consumers and aluminum producers. Thus, from 1989 until around 2009, the LME's

warehouses fulfilled the LME's represented mission of a price-neutral storage place of last resort. During this time consumers were able to acquire aluminum at prices dictated by an open, fair, and free-flowing market.

63.    The LME itself describes its "functions of trading and price discovery [as] underpinned by a global network of approved warehouses and storage facilities as well as approved brands," and notes that "[w]hile delivery occurs in only a very small percentage of LME trades, the possibility of physical settlement plays a vital role in creating price convergence and ensuring our prices closely align with that of the physical spot market."[8]

**Relevant LME Warehouse Market For Purposes Of The Complaint**

64.    As alleged above, an LME warrant for aluminum can only be issued for aluminum that has been placed in an LME-certified warehouse. LME warrants allow persons to convert aluminum into tradable warrants exchangeable for cash or deliverable against trading positions. Because this can only be done with an LME-certified warehouse, Plaintiffs allege a relevant market is the market for LME-certified warehouse services for aluminum.

65.    The relevant geographic market for aluminum warehouse services in LME-certified warehouses is at least as broad as the U.S. and Canada. Although there are LME-certified warehouses around the world, LME-certified warehouses in the United States generally do not face competition from LME warehouses in other parts of the world for the reasons set forth above.

---

[8] *Id.*

**DEFENDANTS CONSPIRE TO ARTIFICIALLY INFLATE THE MIDWEST PREMIUM**

> **Banks And Traders Take Control Of The Aluminum Market By Acquiring LME Warehouses.**

66.     Beginning in early 2010, large banks, such as Defendants JPMorgan and Goldman, took control of the aluminum warehousing industry by acquiring key LME warehouses.

67.     In February 2010, Defendant Goldman acquired Defendant Metro. Metro owns and operates numerous LME-certified warehouses in the United States, including several warehouses in or around Detroit, Michigan; Chicago, Illinois; Long Beach, California; Mobile, Alabama; New Orleans, Louisiana; St. Louis, Missouri; and Toledo, Ohio that store aluminum and other metals.

68.     In July 2010, Defendant JPMorgan acquired Defendant Henry Bath. Henry Bath is one of the oldest warehouse operators in the world and a founding member of the LME. As a founding member of the LME, it is one of only 11 "ring-dealing" members allowed to trade in open outcry auctions on the LME floor. The company also holds a seat on the LME Warehousing Committee, a select group charged with establishing the rules for LME regulated warehouses. Henry Bath owns and operates numerous LME-certified warehouses in the United States, including warehouses in Chicago, Illinois; Baltimore, Maryland; and New Orleans, Louisiana that store aluminum and other metals.

69.     Following JPMorgan's July 2010 warehouse acquisition, the head of JPMorgan's commodities business, Blythe Masters, admitted that "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture . . . . We need to be active in the underlying

23

physical commodity markets in order to understand and make prices."[9] With this statement, JPMorgan admitted not only that it entered into the warehousing business so that it could "make prices" in the commodity, but also that it did so specifically in order to "be active" in the physical aluminum market.

70.     In September 2010, Defendant Glencore acquired Defendant Pacorini. Glencore is a commodities trading and mining company that engages in the production, storage, transportation, marketing, or trading of aluminum and other metals as well as trading derivative products that derive their value from the underlying asset prices of aluminum. Pacorini owns and operates LME-certified warehouses in the United States, including warehouses in Detroit, Michigan; Baltimore, Maryland; Chicago, Illinois; Los Angeles, California; Mobile, Alabama; and New Orleans, Louisiana that store, among other metals, aluminum.

71.     Metro, Henry Bath, and Pacorini collectively operate more than 75 percent of the LME-certified warehouses in the United States and throughout the world. Thus, with these acquisitions, Defendants gained control over the key LME warehouses. Defendants' goal was not simply just to participate in the aluminum market but, in the words of JPMorgan, to "make prices."[10]

**Defendants Conspire To Restrict Aluminum Supply And Drive Up Prices.**

72.     Shortly after acquiring control of the LME-warehousing network, Defendants and their co-conspirators began engaging in a series of concerted actions designed to artificially increase the Midwest Premium and reap increased profits, all at the expense of Plaintiffs and other consumers.

---

[9] *Wall St falls out of love with commodities trading*, Financial Times, https://next.ft.com/content/4d1f8f7a-faf0-11e2-87b9-00144feabdc0 (last visited June 23, 2016, 11:48 AM).

[10] *Id.*

73.     Defendants intentionally and artificially drove up the Midwest Premium through a series of actions which included, but were not limited to: violating LME Information Barrier rules, agreeing not to compete with one another, stockpiling primary aluminum at key LME warehouses, and creating excessively long queues to unload physical aluminum for the purpose of artificially driving up prices.

### Defendants Violate The LME Information Barrier And Work Together To Carry Out The Conspiracy.

74.     At all times material to this Complaint, the LME has had in effect certain "Information Barrier" rules relating to the sharing of confidential information between LME members and related warehouse companies. These rules are designed to maintain the integrity of the market for primary aluminum by preventing the sharing of information relating to the identity of warehouse customers, sensitive pricing information, and certain non-public information about inbound and outbound metal at LME warehouses. The LME rules specifically state that "it is essential that personnel engaged in trading activities in relation to the LME market do not come into possession of any Confidential Information."[11]

75.     Defendants frequently violated the LME Information Barrier by placing bank executives in key positions to receive confidential and valuable information they generally were not permitted to receive.

76.     After acquiring Metro, Goldman installed an entirely new Board of Directors for Metro, comprised entirely of Goldman employees. These board members regularly received valuable and confidential information about Metro.[12] Nearly 50 Goldman employees, including

---

[11]  S.R. at 226. Available at: http://www.hsgac.senate.gov/subcommittees/investigations/hearings/wall-street-bank-involvement-with-physical-commodities-day-one
[12]  S.R. at 220.

executives and traders, had access to this information. For example, Scott Evans, a senior trader for the physical metals desk within the Commodities Division of Goldman Sachs International and/or with Goldman's J. Aron trading division, was responsible for dealing directly with Metro on behalf of Goldman Sachs. He received trading information from Metro, including advice on bids Goldman Sachs should place on Glencore metal.

77.     At JPMorgan, Peter Sellars was the Head of Global Metals of the Global Commodities Group, Chairman of the Board, and also a director of Henry Bath & Son, Ltd. JPMorgan Securities transacted directly with Metro regarding aluminum storage in the United States on a deeply involved and continuing basis – so much so that Sellars communicated directly with Metro's President and CEO, Chris Wibbelman, about their business together.

78.     It was not uncommon for the Defendants to share among themselves what should have been confidential, competitive freight incentive information. For example, on one occasion, Metro's CEO noted competitive information received from Pacorini regarding freight and incentive prices.

79.     Similarly, on information and belief, Stephen Branton-Speak, a former partner at Goldman Sachs International who presided over the formation and management of the physical-metals trading desk within the Commodities Division of Goldman Sachs International and was an LME board member, initiated an email chain with Jacques Gabillon, a Managing Director at Goldman Sachs International and the Head of Global Commodities Principal Investments, and also the Chairman of the Board and Board Member of MITSI Holdings LLC, about a deal Metro was not paying enough to win. Branton-Speak asked whether Gabillon was "Happy to lose this one?" prompting Gabillon to forward the email to Wibbelman who said he was holding at 125.5 (50 cents above highest ever). "Scott said that on several previous deals too, and we got it at my

number. I could look silly if I lose 90,000 tons for a few bucks. But we are being worked by Alcoa. And by GS. And by all other customers. It is hard to hold firm." Gabillon then passed along that "Steve saying he is going to pass then, whatever that means." Wibbelman noted that the "Midwest [premium] US is 6.35 cents/lb so, 139 days with 30 days credit and credit risk. But the premium will go down if we force it there. Also, Metal Bulletin and European Economics would notice 130. Steve can always buy it and earn contango until he delivers it to us. (Which I know is not as good for us but points out that I am not the only one letting it go for a few dollars)." Gabillon asks what would happen if Metro just bid $100. "They would sit on it and wait for spot commitments. By selling, premiums would come down though. No warehouse can bid that much but us . . . ." Wibbelman later comments: "What is true though, is that the metal we get is withheld from consumers and makes the premium go up . . . which provides a competitive alternate to customer." This shows not only illicit communication between Goldman's traders and Metro (with specific communication about whether or not a deal would be transacted based on what should be confidential pricing information), but also that Metro knows very well what the Midwest Premium measures at for any given time and how its freight incentive interacts with this premium. Metro knows that metal it gets is "withheld from consumers and makes the premium go up."

### *Defendants Agree Not To Compete With One Another.*

80.     Once Defendants had obtained control of the LME warehousing network, they agreed that their respective aluminum warehousing operations would work together and not compete against each other. Defendants used the very transparent LME exchange and its warehouse system as the mechanism to coordinate their collusive agreement, to monitor the behavior of the collusive group, to limit the ability (and temptation) of the collusive group to cheat, and to lock in collusive profits.

81.     For example, Goldman/Metro and Glencore/Pacorini agreed to allocate the key aluminum warehousing cities of Detroit and Vlissingen, Netherlands, between themselves. When Metro began to run out of warehouse space in Detroit, Pacorini offered to lease Metro space rather than compete against it. Upon information and belief, an internal Metro email noted that Pacorini "have maintained all along that they have no desire to nitpick us in Detroit otherwise Glencore would have done this long ago. Besides they know we [Goldman/Metro] would retaliate incrementally in some place like Vlissingen." This email demonstrates market allocation among Defendants: the co-conspirator Defendants knew that if one of them violated the conspiratorial agreement, the others could retaliate in key locations such as Glencore and Pacroini's operations in Vlissingen.

82.     Metro also understood that JPMorgan's Henry Bath warehousing operations would not compete with it.

### Defendants Stockpile Aluminum To Create Excessively Long Queues.

83.     After agreeing not to compete against one another, Defendants worked with each other to stockpile aluminum at key LME locations. Defendants did this by: (1) working around LME load out rules to minimize the amount of aluminum that left their affiliated warehouses; (2) offering incentive payments for aluminum owners to store aluminum at warehouses with queues; (3) strategically cancelling warrants; and (4) shuffling aluminum among their warehouses rather than releasing it to the public.

### Defendants work around load out rules to minimize the amount of aluminum leaving their warehouses.

84.     A large part of Defendants' conspiracy required working around LME load out regulations which obligated each warehousing company to load out a minimum of 1,500 MT per day per location.

85.     However, the load out requirement was per company and not per warehouse. If a company owned multiple warehouses in one city (for example, Metro's several warehouses in Detroit), all those warehouses together would need to load out only 1,500 MT per day.

86.     The minimum load-out was far less than the amount Defendants' warehouses could load out if they were attempting to operate their warehouses with the goal of efficiency, rather than market manipulation. It has been estimated that each warehouse using only two forklifts could load out as much as 1,920 MT per day. Thus, for example, the Metro warehouses in Detroit (which, by one count, numbered 27) could collectively deliver in excess of 50,000 MT per day, rather than the 1,500 MT minimum that they treated as a daily maximum load out.

87.     Despite the huge quantity of aluminum stored in the LME warehouses, the loading out rate prior to April 2012 was, on most days, barely above the then-required minimum under LME rules, 1,500 MT per day per company per city for the largest warehouses. The purported minimum LME aluminum loading-out rate therefore operated as a *de facto* uniform or maximum load-out rate.

88.     As a result of the warehouses' excessively (and intentionally) slow loading-out rates, lengthy and persistent queues of over one year developed for delivery of aluminum.

89.     Defendants were well aware of the relationship between the LME load-out requirement and the effect the long queues had on the Midwest Premium.[13] For instance, upon information and belief, on June 21, 2010, Metro's CEO Wibbelman emailed a colleague at Metro to convey a message at an upcoming steel conference:

---

[13]     Moreover, upon information and belief, Metro and Goldman privately lobbied the LME as part of their "strategy for defending 1500mt/day" and "struggling to maintain the status quo."  Throughout the LME rule-making process for new load-in rates, Goldman and Metro provided steady input to the LME, which was always considered and frequently accepted.

> That, outbound shipment at the scale indicated would be detrimental to the LME warehouse system and the LME's market share and success. Detrimental to the producers, detrimental to the premium, detrimental to the price, detrimental to the contango, detrimental to the amount of stock on LME (so detrimental to transparency and liquidity).

With this, Wibbelman specifically noted that a higher load-out requirement will push down the Midwest Premium and will diminish traders' opportunities for contango trades.[14]

90. Upon information and belief, in a December 2010 email, Wibbelman explained how Defendants working together as a cartel accomplished their scheme: "physical traders in conjunction with banks and producers hold [aluminum] stock and withhold metal sales to consumers in order to squeeze up the premiums."

91. As the Senate Report noted, "[i]f a bank's affiliate owns or controls a metals warehouse…the bank has the means to affect the marginal supply of a commodity and can use those means to benefit the bank's physical or financial commodities trading positions."[15]

**Defendants offer incentive payments to attract more metal to warehouses with long queues.**

92. Defendants also ensured that their warehouse inventories remained high by offering incentives to aluminum producers and traders to deposit aluminum in their warehouses, and to aluminum warrant owners to continue to store aluminum in their warehouses. Such incentive payments indicate market manipulation in the current context.

93. *The New York Times* reported that Defendant Metro offered owners incentive payments of up to $230 a ton to continue to store their aluminum at Metro warehouses.[16]

---

[14] Contango results when the futures or forward price of a commodity is higher than the expected spot price.

[15] S.R. at 38.

94.     Defendant Glencore engaged in the same conduct in Vlissingen. According to Reuters, quoting a London-based trader: "Fresh material is being bid slightly because Pacorini are paying big incentives to get metal there, in Vlissingen. Then they deliver it to the market and whoever holds it can't actually get it out for a year."[17]

95.     These incentive payments have, moreover, been paid by the strategic chokepoint warehouses, e.g., Metro in Detroit and Pacorini in Vlissingen, as a means to attract metal to *particular* warehouses where existing and growing queues were thereby exacerbated in order to drive up the Midwest Premium.

96.     Upon information and belief, Goldman and Metro understood that they could pay higher incentives to attract metal into warehouse locations with queues. Metro differentiated among its warehouse locations when deciding how much it could or would pay as a freight incentive or other warranting specifics.  It is reasonable to assume the other Defendants, who were experienced traders and warehouse operators, would have the same understanding.

97.     In its Summary Public Report of the LME Warehousing Consultation dated November 2013 (after its acquisition by non-defendant, Hong Kong Exchange), the LME stated that it "considers the fundamental role of the queues is to increase premiums, [and] it must follow the most logical course of action is to address the existence of those queues."[18]

98.     Defendants used the LME warehouses as the mechanism to facilitate their collusive agreement. Once aluminum was put into the LME warehouses, volumes of aluminum

---

[16]    David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[17]    Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*, CHICAGO TRIBUNE (April 27, 2012).

[18]    *Summary Public Report of the LME Warehousing Consultation*, LME.com, https://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/Public%20Report%20of%20the%20 LME%20Warehousing%20Consultation.pdf. (last visited June 23, 2016, 12:01 PM).

inventories could be verified as warrants were confirmed. The speed at which the aluminum was removed from the warehouse was slowed, and at the same time, the collusive parties were able to lock in profits while not allowing the aluminum to actually reach the physical market due to a year or more delay in load out. This also led to longer storage times and therefore, longer storage fees.

99.     On information and belief, Defendants actually met and discussed their inducement payments on at least one occasion as part of an LME warehouse committee meeting on March 13, 2012. The LME warehouse committee minutes noted that "exceptional inducements" could "have the effect of constraining the market." The minutes further state, "A discussion followed regarding inducements and what was an acceptable level, however no consensus was reached and differing opinions were given as to why inducements occurred and at what level." Thus, using the LME, Defendants were able to freely discuss what inducement they were paying at what locations to further their ability to move metal into key locations.

### Defendants work together to strategically cancel warrants and favor each other with preferential treatment.

100.     To issue a warrant means that aluminum has been checked into a warehouse for storage, and to cancel a warrant means that a request has been made for physical delivery of the aluminum from the warehouse. A queue forms when metal owners request delivery of their aluminum at a rate greater than the LME's daily load-out requirement.[19]

101.     Warrant cancellation activity began to increase once Goldman Sachs, JPMorgan, and Glencore entered the aluminum warehousing industry, and exploded at the end of 2011, once the scheme set forth above was fully in place.

_____

[19] S.R. at 191

102.    Upon information and belief, these levels of warrant cancellations by Defendants had nothing to do with the actual need for physical aluminum and everything to do with creating lengthy load out queues in order to manipulate prices, including increasing regional premiums such as the Midwest Premium.

103.    According to the trade publication American Metals Market in a February 4, 2011 report:

> A sharp increase in canceled aluminum warrants in London Metal Exchange-registered warehouses in Detroit is part of a "revenue game" and not a true reflection of physical demand, market sources told AMM Friday. Canceled warrants in Detroit jumped by nearly 45,000 tonnes overnight to 79,125 tonnes Thursday, rekindling the finger-pointing that followed September's 100,00-tonne increase and igniting chatter from traders about the real motives behind the move. A number of traders said the cancellations could be little more than "warehousing games," where one player cancels warrants to increase the queue at a warehouse.

104.    In September 2010, Metro was involved in creating large warrant cancelations at its Detroit warehouse. That same month, JPMorgan canceled warrants in Detroit. The purpose and effect of these cancellations was to lengthen the queue. Similarly, in December 2011, JPMorgan and Glencore entered into an unusually large aluminum swap involving Pacorini BV's Vlissingen and Metro's Detroit warehouses. Under the agreement, JPMorgan gave 860,000 MT of aluminum located in Metro's Detroit warehouse to Glencore International AG. Glencore International AG gave JPMorgan 860,000 MT of aluminum located in Pacorini's Vlissingen warehouse. The 1.72 million MT involved represented over a third of global LME aluminum stocks.

105.    Once the swap was completed, JPMorgan immediately canceled warrants for 500,000 MT of aluminum that it had acquired from Glencore and that was now stored in

Pacorini's Vlissingen warehouse. As intended, JPMorgan's warrant cancellations instantly created a large queue in Vlissingen—one that would grow to over 700 days.[20]

106.    JPMorgan acquired $1.9 billion worth of physical aluminum either immediately before or as part of the swap. At the time, JPMorgan's physical aluminum holdings equated to more than half of the physical aluminum consumed in North America that year. According to the Senate Report, the $1.9 billion acquisition was so large that it caused JPMorgan to hold more than 5% of its Tier 1 capital in physical commodities—in breach of the limits imposed by the Office of the Comptroller of Currency and the Federal Reserve.[21]

107.    The amount of aluminum warrants canceled far exceeded any legitimate need for physical aluminum. The surge in canceled warrants was a sea change in the LME system. Previously, canceled warrants represented a tiny percentage of total stocks and were tonnages destined for nearby consumer deliveries or, more likely, being readied to move to other warehouses under incentive schemes. With warehouses now under Defendants' control, Defendants started to make use of the restricted load-out spigot to cancel significant amounts of warrants in order to isolate consumers from spot LME warehouse metal and push premiums higher. Defendants progressively canceled, or caused to be canceled, many more warrants than they needed for their spot commitments to give themselves places in the queue in each forward month for metal they owned and financed so that: (1) the premiums would continue to rise; and (2) at the end of each queue time period, they would have metal available for load-out to sell at

---

[20] *Detroit aluminum warrant cancellations said 'a revenue game,'* MetalBulleltin.com, https://www.metalbulletin.com/Article/2762432/AMM-Detroit-aluminum-warrant-cancellations-said-a-revenue.html (last visited June 23, 2016, 12:10 PM).

[21] S.R. 379-384.

inflated premiums. Consumer customers who could not afford to finance a year's worth of supplies were excluded from access to reasonably priced spot metal.

108.     Defendants manipulated the supply of aluminum by purchasing inventories of aluminum, placing them under warrant at the key LME warehouses, followed by dubious "transfers" to, in many cases, Defendants themselves or their affiliates, canceling the warrants based on such "transfers," and then reinstating the warrants once the aluminum has reached the next warehouse.[22] Among other indicia of manipulation by Defendants is the fact that the amount of aluminum warrants they canceled far exceeded any legitimate need they may have had for physical aluminum. This misconduct diverted aluminum from actual aluminum users and created an artificial shortage of aluminum and thus, the higher Midwest Premium complained of herein.

109.     In addition, Metro also gave JPMorgan preferential treatment in its warehousing queues, and in September 2010 loaded out aluminum owned by JPMorgan by moving its position in the queue ahead of metal warranted to other owners. This accommodation was not only against the interest of others in the queue, but apparently also against the interest of Metro itself. According to Metro's CFO, David Grupenhoff, the change cost Metro approximately $295,000 in lost rent (from JPMorgan) and offsetting payments to the warrant-holders who lost their place in the queue.

110.     On July 7, 2010, Sellars, the head of JPMorgan metals and Chairman of Henry Bath, emailed Wibbelman, Metro's CEO, about a loading out dispute at Metro's New Orleans location. Metro had refused to load trucks that missed their appointed time slots (prompting the JPMorgan trader to comment: "Metro talks about cooperation between our companies, but has a

---

[22] David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

strange way of showing it."). Sellars then forwarded this email to Wibbelman confirming that he expected different treatment after a recent "brief chat" they previously had and proposed an upcoming dinner to discuss the "overall situation." Sellars then wrote: "As you are well aware this is material sold to the fabrication industry by my traders . . . we do NOT take material for re-warehousing."

111.    Despite acquiring the Henry Bath warehouses, Sellars was emphatic to point out to Wibbelman that JPMorgan was "NOT" taking the metal to re-warehouse in its own facility. Instead, JPMorgan pointed out that it was selling the metal to fabricators, where it presumably was able to charge a premium. Sellars concluded: "I don't really care what your rules are for anyone else . . . ." The upshot of this communication was that Sellars did not want Metro to retaliate, as it was not "destocking" Metro's warehouse; rather, it was selling its aluminum to fabricators.

112.    Later in October 2010, Wibbelman and a senior trader from Goldman's metals desk, Evans, discussed the possibility of Goldman/Metro acquiring metal from a Henry Bath warehouse. Wibbelman wrote: "I am concerned if this comes from a warehouse other than HB, since JPM and GS could set off a warehouse war between Metro and, say, Steinweg or CWT." Notably, Wibbelman was not concerned that taking metal out of Henry Bath would set off a warehouse war. Rather, Wibbelman was only concerned about the possibility of Goldman/Metro taking metal from a non-conspirator, such as Steinweg, who was a large independent warehousing company.

113.    Additionally, JPMorgan was storing aluminum it owned in warehouses owned by Metro, and paying the associated storage fees at "full retail" prices, despite the fact that JPMorgan actually owned its own warehousing subsidiary in Henry Bath. This conduct was at

least against JPMorgan's own economic self-interest, and at most, a bold attempt to transfer

funds to a firm it (through Henry Bath or directly with Goldman Sachs, which owns Metro)

should have been competing with for the very service for which JPMorgan was paying.

**Defendants shuffle inventory between warehouses and work together to prevent aluminum from becoming available.**

114.     Although the inadequate load-out rules would by themselves have been sufficient

to create a backlog given Defendants' hoarding of aluminum and manipulation of the

cancellation process, Defendants evaded even those minimal rules by shifting inventories of

aluminum from one LME-certified warehouse to another (or to non-certified warehouses) so as

to appear to comply with the load-out rules while actually maintaining their inventories, and the

associated artificially-created queues.

115.     A *New York Times* article, which was based on an extensive investigation and

contains quotes from individuals with direct knowledge of Metro's practices in Detroit, describes

those practices:

> Each day, a fleet of trucks shuffles 1,500-pound bars of
> [aluminum] among the warehouses. Two or three times a day,
> sometimes more, the drivers make the same circuits. They load in
> one warehouse. They unload in another. And then they do it again.

116.     One former Metro forklift driver, Tyler Clay, described this process as a "merry-

go-round of metal."[23] The result is that, despite the LME's load-out rules, "nearly all of the metal

that Metro moves is not delivered to customers . . . . Instead, it is shuttled from one warehouse to

another."[24]

---

[23] David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[24] *Id.*

117.    The Senate Report likewise noted that "some of the financial holding companies used or contemplated using physical commodity activities, such as…merry-go-round trades…that had the effect or potential effect of manipulating or influencing commodity prices."[25]

118.    This "merry-go-round" was not the result of ineptitude; rather, it was a strategy by Defendants to create longer wait times for the physical delivery of aluminum, thereby impacting the wider aluminum market, including the market for aluminum futures. Furthermore, according to *The New York Times*' sources, "the longer waiting times are part of the company's strategy and help Goldman increase its profits from the warehouses."[26]

119.    In addition to shifting aluminum between LME-certified warehouses for no valid, lawful purpose, Defendants also moved aluminum, or caused it to be moved, to non-LME warehouses they owned or controlled. According to the *Wall Street Journal*, as of October 2013, some 7 million to 10 million MT of aluminum were being housed in facilities known within the industry as "shadow warehouses."[27] The movement of aluminum from LME warehouses into shadow warehouses satisfied the LME's load-out requirements without ever releasing any aluminum into the market. This further restricted supply and drove up prices.

120.    Defendants' shuffling of aluminum included deals with other parties, such as Deutsche Bank and Red Kite. In or around September 2010, Metro entered into an agreement with Deutsche Bank to move aluminum between Metro warehouses in Detroit. Metro paid Deutsche Bank an incentive fee to cancel 100,000 MT of aluminum, place it in the queue, and

---

[25] S.R. at 9-10.
[26] *Id.*
[27] Tatyana Shumsky, *Millions of Tons of Metals Stashed in Share Warehouses*, THE WALL STREET JOURNAL (December 23, 2013).

move it between Metro's Detroit warehouses only to eventually re-warrant the metal in Detroit. Metro entered into a similar deal with Red Kite in which Red Kite would eventually cancel over 500,000 MT of aluminum warrants. Metro performed the logistics of moving the metal to an off-LME warehouse storage site, only to guarantee Red Kite an incentive to re-warrant the metal (and charge it a "break fee" if it did not re-warrant the metal as agreed). Notably, the vast majority of this aluminum would simply be re-warranted in Detroit. On other occasions, Metro agreed with metal owners to store metal at non-LME warehouses pursuant to the agreement that it would be "subject to" the Detroit queue, even though it was not warranted metal.

121.    There simply was no valid business justification for these machinations. Rather, their purpose and effect was to improperly increase the Midwest Premium by creating and maintaining artificially long queues in the relevant LME warehouses.

122.    Goldman recognized that the Midwest Premium started to rise when aluminum stopped flowing out of non-Detroit locations. In other words, when the only source for available metals was in Detroit, a person wanting that metal had to go through the queue. Given the length of the queue, it was not a viable option for a purchaser who needed spot metal from a warehouse to buy metal from Detroit. As a result, the Midwest Premium spiked up. Goldman specifically noted that "US Midwest premiums started to rise quickly in Mar 11 when Baltimore and Chicago (non-Metro locations) stopped flowing out. One can assume that most metal outside of Detroit has now been tied-up in financing deals."

123.    Defendants engaged in deals with each other to further tie up aluminum not already stored in Detroit. For example, in or around October 2011, JPMorgan and Metro entered into a rent deal concerning JPMorgan's aluminum stored at Metro's Mobile, Alabama location. On October 25, 2011, Metro's Wibbelman requested authority from Goldman's Jacques Gabillon

and Greg Agran to approve a rent deal with JPMorgan. At the time, JPMorgan owned nearly all of Metro's 160,000+ MT of aluminum. JPMorgan had apparently been moving some of its metal to its Henry Bath location, but chose instead to enter a rent deal with Metro. This deal insured the aluminum would not be available to the market. It also furthered the improper, anticompetitive goal of keeping aluminum from being readily accessible to the spot market.

124.    As a further example of Defendants' anticompetitive conduct, JPMorgan kept its metal in a competitor's warehouse rather than move it to its own location in New Orleans or Baltimore, even though JPMorgan appears to have been the only company storing metal in Mobile. JPMorgan could have moved the aluminum to its own warehouse (and paid less rent) while at the same time preventing its warehouse competitor from collecting any rent from its Mobile operations. Instead, contrary to any valid business reason, JPMorgan stored over 150,000 MTs of aluminum with its competitors, which is about 7.5 percent of the U.S. annual domestic production – no small amount.

125.    During the times material to this Complaint, Defendant Metro frequently dealt directly with Defendants Glencore and JPMorgan. These dealings included both the storage of aluminum owned by those Defendants at Metro warehouses as well as entering into sweetheart transactions designed to allow those Defendants to take metal from Metro warehouses without being subject to the Metro queues.

**DEFENDANTS CAUSE THE MIDWEST PREMIUM TO RISE AND REAP INCREASED TRADING PROFITS AND STORAGE FEES.**

### Queues Rise Dramatically As The Amount Of Aluminum Stored In LME Warehouses Soars.

126.    From January through June 30, 2011 (mere months after Goldman's purchase of Metro), Metro warehouses in Detroit took in 364,175 MT of aluminum and delivered out

171,350 MT.[28] That represented 42 percent of inventory arrivals globally and 26 percent of the metal delivered out, according to LME data.[29] Before Goldman bought Metro, warehouse customers waited an average of six weeks for their purchases to be delivered to factories.[30] After Goldman's acquisition of Metro, the wait skyrocketed, reaching a reported 674 days in March of 2014.[31]

127.    These same issues were reported in the Vlissingen, Netherlands warehouses (where Pacorini BV, owned by Glencore, is the dominant operator). Queues of about a year were reported for aluminum stored in Vlissingen. Glencore created those queues through a deliberate effort to hoard aluminum in those warehouses by payment of incentives.[32] As of December 2012, the Vlissingen LME warehouses stored more aluminum (1.44 million MT) than the LME Detroit warehouses (1.42 million MT).[33] As of March 31, 2014, the queue at Pacorini Vlissingen was reported as 610 days, as compared with 518 days on June 30, 2013.

128.    From the end of 2008 to around 2013, the amount of aluminum held in LME warehouses worldwide soared, from about 1.1 million MT in July 2008 to about 4.5 million MT in April 2013, a five-fold increase.

---

[28] Pratima Desai, et al., *Goldman's new money machine: warehouses*, Reuters (July 29, 2011).

[29] *Id.*

[30] David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[31] S.R. at 193.

[32] Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*, CHICAGO TRIBUNE (April 27, 2012).

[33] Agnieszka Troskiewicz, *Dutch Fishing Port Overtakes Detroit as Top Aluminum Location*, BLOOMBERG (Dec. 14, 2012).

129.    In January 2008, there was less than 400,000 MT of aluminum stored in US LME warehouses. By January 2013, Metro's Detroit warehouses alone stored 1.4 million MT of aluminum.

**The Shortage Of Available Spot Aluminum Causes The Midwest Premium To Dramatically Rise.**

130.    The Midwest Premium fluctuated between four and eight cents per pound ($90-$180 per MT) during the period 2004 through 2008, which was characterized by robust aluminum consumption and LME Cash Prices which peaked at about $3,000 per MT. In the period between 2008 and 2010, during the financial crisis, recession, and subsequent tepid recovery, the Midwest Premium reflected downward market pressure and fluctuated between three to six cents per pound ($65-$130 per MT) at a time when the LME Cash Price was also much lower, fluctuating between $1,300-$2,200 per MT.

131.    Starting in February 2011, and due to Defendants' anticompetitive conduct, a markedly different pattern emerged. Economic conditions were still poor at this time and there was a huge global surplus of aluminum. Accordingly, the LME Cash Price began a decline from $2,600 to a low of $1,730. The Midwest Premium, however, moved in the opposite direction. Beginning in February 2011, the Midwest Premium spiked in three months from 6.45 cents to 8.94 cents per pound and then continued to rise during 2011 through 2013 to the then-current all-time record of 12 cents per pound ($265 per MT) in July 2013. In January 2014, the Midwest Premium surged to more than 20 cents per pound. The Midwest Premium was a little over 3 percent of the LME Cash Price at the height of the bull market in 2008, but eventually reached over 14 percent of the LME Cash Price – at a time when global surpluses of aluminum had never been higher.

132.    This increase in the Midwest Premium and other regional premiums was borne by purchasers of aluminum, and was the result of Defendants' anticompetitive conduct. For a long time, although aluminum purchasers could hedge against the LME Cash Price, no major financial institution offered a hedge against rising regional premiums (including the Midwest Premium) – even though, as explained before, Goldman Sachs and JPMorgan (among other major investment banks) were active participants in the market for commodities-related derivative instruments. The uniformity and depth of the antitrust injury inflicted on Plaintiffs by Defendants' conduct is amply illustrated by the fact that during almost the entire period of time material to this Complaint, aluminum purchasers could not obtain hedge or similar risk management protection against rising Midwest Premium levels.

**Defendants Benefited From Their Conspiracy Through Increased Trading Profits And Increased Storage Revenues.**

*Banks And Trader Defendants Profited From Physical Sales And From Trading.*

133.    Defendants' trading arms manipulated the spot metal price, including the Midwest Premium, so they could reap extraordinary profits.

134.    In addition to operating warehouses, Defendants sell aluminum to industrial users on both an annual and spot basis. Consistent with industry practice in the United States, Defendants charge the Midwest Transaction Price, which includes the Midwest Premium. Defendant Glencore sells aluminum to industrial users in the United States and charges them the Midwest Premium. JPMorgan sold aluminum to industrial consumers, such as the fabrication industry and also included the Midwest Premium in its prices. Goldman did the same.

135.    Because Defendants generally did not pay the Midwest Premium when acquiring aluminum, Defendants stood to reap additional profits on these spot transactions by artificially inflating the Midwest Premium. Defendants obtained aluminum by obtaining LME warrants or

43

engaging in supply transactions with aluminum producers, which often involved their LME warehouse operations. Defendants were able to sell either metal that had worked its way through the queue, metal that was in one of their warehouses without a queue, or even metal that was held off-warrant. Thus, increases to the Midwest Premium allowed Defendants to sell aluminum for more than they otherwise could have had they not engaged in anticompetitive conduct. This anticompetitive result provided them with yet another motive to conspire.

136.    Upon information and belief, in a May 24-25, 2011 email entitled "Ali Premiums," Robert Burgess-Allen, who consults with Metro on aluminum deals, inquired with Metro's Wibbelman about a potential transfer of Toledo metal to Detroit in exchange for a $20 release fee. He notes that if the release to Detroit does not occur, "that material is worth whatever we start bidding the MWP to be so even at a conservative $160 which equals a equiv warrant premium for Toledo of $100-120. We still take the $20 to the broker / the $35 cost of roll and bank the $45/65 profit…I am ever concerned that the big picture is being missed here—*if we want to sell premium we have to almost act as physical traders. We are in effect gaining premium on something we are not technically entitled to*. If we don't want to sell and want to contango finance without paying a $20 fee—this is possible but it will take us 18 months to break even…" (emphasis added.) This communication makes clear that Metro and Goldman have eliminated the line between trader and warehouseman, and Metro is no longer satisfied with mere rent deals that take a period of time to become profitable. Burgess-Allen continues, "If we lock Mobile / Long Beach in US with JP which is highly possible the premium for the US materials will go raging higher and we may be told that $20 simply does not cut it. We will not be getting premium returns from JPM…If the answer is to be NO on any more sale premium being agreed up front then at least lets make that decision and get the bad news out there.

Everyone wants resolved before month end including settlement…I know you know all this—I also know you agree—I don't mean to keep pointing out the same facts its just seems so bizarre that we for the first time in years when called upon to be as decisive as we have always been pre GS…are faltering. Not what Metro are known for I think you would agree." Not only was Metro acting as a trader, but it was contemplating an arrangement to "lock" Mobile and Long Beach with JPMorgan, with the anticipated result being that the premium will go "raging higher."

137.    Six weeks later, Wibbelman emailed Wheland and Prichard, noting that "Jacques has me on hold for sending the JPM letter until JPM legal and compliance weighs in. Really can't blow my nose without permission anymore." Apparently Metro was in direct communication with JPMorgan (rather than communication with or through Henry Bath). It is reasonable to infer, particularly in light of this timeline and the Burgess-Allen communication referenced above, that a "JPM letter" implicating the review of JPMorgan legal and compliance departments dealt with some form of agreement between the Defendants, and one of at least questionable legality.

138.    As the Senate Report noted, Goldman and JPMorgan had, or acquired, enormous physical holdings of aluminum during the period in question.[34] At the time Goldman acquired Metro in February 2010, it did not own any physical aluminum. By the end of 2012, Goldman's physical aluminum holdings exceeded 1.5 million MT, and were worth more than $3.2 billion. JPMorgan's physical aluminum holdings at the end of 2011 were valued at $6.5 billion. In January 2012, JPMorgan's inventory peaked at over 3.5 million MT, valued at almost $7.5 billion. When these Defendants sold physical aluminum holdings, they were able to charge the applicable regional premium.

---

[34] S.R. at 3, 169, 318, 380-81.

139.    The Defendant banks and traders also profited from trading activities related to artificially elevated premiums they had illegally created. When a commodities market is in contango (when the futures price is higher than the expected spot price), a holder of the commodity has an opportunity for profit if storage and financing costs for holding the commodity are less than the difference between the expected spot price and the futures price. Where, as here, the same or related parties could simultaneously: (1) hold; (2) store; and (3) finance the commodity, there was a ripe opportunity for aluminum market manipulation and collusion at the expense of bona fide purchasers of physical aluminum. Defendants' use of incentives for storage of aluminum in their warehouses also encouraged such manipulation by lowering carrying costs. As the Senate Report noted, "[i]f the bank's affiliate owns a metals warehouse and the bank trades metals in the futures market, the bank may time the release of the warehoused metal in ways that benefit the bank's own commodities positions and contrary to the interests of its clients."[35]

140.    The trading arms of the bank Defendants, along with Glencore's trading operation, engaged in futures transactions in the LME forward contract market. As discussed above, these traders and banks seized the opportunity to purchase aluminum during the times material to this Complaint and sold it forward for a future profit, due to the prevailing market contango. In order to take the future short (selling) position in the LME market, there must be corresponding long (buying) positions. Many of these long positions reflect industrial users of aluminum who know that they will need a quantity of aluminum on future dates but seek price protection against inflation of the LME Cash Price. By contrast, these industrial users had no protection against the artificial inflation of the Midwest Premium.

---

[35] S.R. at 37.

***Defendants' Warehousing Operations Increased Storage Profits.***

141.    LME warehouses generally earn revenue in two ways.[36] First, warehouses earn rent for each day they store metal within their warehouse. Second, warehouses charge Free on Truck ("FoT") rates, which are essentially delivery-out charges relating to the release of the metal from their warehouse.

142.    Warehouses set their maximum daily rent and FoT rates on an annual basis. The annual period runs from April 1 to March 31. Warehouses must submit their rents and FoT rates to the LME by December 1 of the preceding year. The LME then publishes this information. Each warehouse thus knows its competitors' annual maximum daily rent and FoT rates.

143.    Warehouses with queues are incentivized to publish higher rents and FoT rates, because the existence of a queue guarantees metal must be stored for a minimum amount of time. In contrast, warehouses without queues should be incentivized to publish lower rents and FoT rates in order to attract metal. Nevertheless, the rents for all three Defendant warehouses largely moved in lockstep.

144.    Thus, warehouses benefited from the existence of queues in the system by being able to charge higher rents.

**Defendants Exit The Market Upon Investigatory Scrutiny.**

145.    As a result of the conduct set forth above, large purchasers of aluminum made formal complaints to the LME and other authorities.

146.    For example, Coca Cola filed a complaint with the LME in June 2011, accusing Goldman Sachs of creating supply bottlenecks at the Detroit warehouses to artificially raise the

---

[36] *Summary Public Report of the LME Warehousing Consultation*, LME.com, https://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/Public%20Report%20of%20the%20LME%20Warehousing%20Consultation.pdf (last visited June 23, 2016, 12:01 PM).

price of aluminum. In that complaint, Coca Cola stated that it takes more than seven months to access aluminum from the Detroit warehouses.[37]

147.    Subsequently, the Beer Institute, a trade group representing beer brewers, filed another complaint with the LME. According to a statement released by the Beer Institute in conjunction with the complaint, Defendants' rules and practices "are interfering with normal supply and demand dynamics" and have "led to a complete disconnect between LME aluminum prices and actual aluminum prices and prevent brewers and their suppliers from obtaining aluminum in a reasonable timeframe at fair-market prices."[38]

148.    Defendants' conduct also sparked government investigations, both domestically and abroad. In May 2011, the Science and Technology Committee of the House of Commons of the Parliament of the United Kingdom reported a concern that "the ownership of metals storage warehouses by a dominant dealer on the London Metals Exchange" (apparently referring to JPMorgan) may be anticompetitive and referred this concern to the Office of Fair Trading.[39]

149.    In November 2014, the U.S. Senate Permanent Subcommittee on Investigations released the Senate Report on its probe into potential abuses in energy and metals markets, including looking into Defendants' involvement with the aluminum markets.[40] The report noted that the fact that Goldman "engaged in extensive aluminum trading at the same time it was

---

[37]    Dustin Walsh, *Aluminum Bottleneck: Coke's complaint: 12 percent of global stockpile held here, boosting prices*, CRAIN'S DETROIT BUSINESS (June 26, 2011).

[38]    Joe Richter and Agnieszka Troskiewicz, Beer Companies Press LME to Cut Aluminum Warehouse Backlogs, BLOOMBERG (June 23, 2013).

[39]    United Kingdom Parliament, House of Commons Science and Technology Committee, "*Fifth Report: Strategically important metals*," ¶¶79-81 (May 2011). Available at: http://www.publications.parliament.uk/pa/cm201012/cmselect/cmsctech/726/72602.htm.

[40]    S.R. at 169.

approving practices leading to a long warehouse queue has given rise to serious doubts about the integrity of the aluminum market."[41]

150.    To the extent they have wound down this collusive restriction of the available aluminum on the market, the collusive group was able to lock in their profits by exiting together before most of the other holders of metal in the warehouses, leaving these slower market participants to take the comparative loss, while the collusive group gained.

151.    As a result of increased industry, media, and regulatory scrutiny, many of the Defendants changed their practices or exited the warehousing business altogether.

152.    In March of 2014, JPMorgan sold its physical commodities trading business, which included its aluminum warehousing.[42]

153.    Goldman soon followed suit. On July 31, 2013, Goldman Sachs announced several steps to reduce load-out times at the Metro Detroit warehouses, including offering purchasers immediate delivery and prioritizing purchasers who actually intended to use the aluminum over traders and speculators in the queues. Goldman's commitment to changing its business practices, however, was short lived. By August of 2015, Goldman was completely out of the aluminum warehousing business.[43]

154.    Most importantly, only a few months after it came under new ownership that was independent of the other Defendants, the LME announced aggressive new initiatives to reduce queues, including proposing the simple step of requiring those warehouses experiencing

---

[41] *Id.*

[42] *See* Dmitry Zhdannikov and Chris Peters, *JPMorgan sells physical commodities until to Merduria for $3.5 billion*, REUTERS (Mar. 19, 2014).

[43] *See* Josephine Mason, Exclusive: *Goldman puts Metro metals warehousing unit up for sale*, REUTERS (May 20, 2014).

excessive queues to load out more aluminum than they load in.[44] There is no legitimate reason why this obvious action could not have been taken when the complaints about the excessive queues first surfaced.

**PLAINTIFFS SUFFERED INJURY RESULTING FROM DEFENDANTS' CONSPIRACY.**

155.    Defendants' manipulation of aluminum on the market made prices higher for all consumers of metal compared to what they would have been if the release of aluminum from LME warehouses had been timed to meet when the metal was demanded.

156.    Defendants' collusion and manipulation affected the pricing of millions of dollars' worth of aluminum in the United States and other parts of the world. Between 2011 and 2014, alone, Southwire purchased over 650,000 tons of aluminum at an inflated price due to Defendants' conduct. Over the same time period, Reynolds purchased over 380,000 tons of aluminum at an inflated price.

157.    Plaintiffs have suffered antitrust injury due to Defendants' misconduct alleged above in the form of having to pay an illegally and artificially inflated Midwest Premium. Absent Defendants' misconduct, the Midwest Premium Plaintiffs paid would have remained stable or, more likely, decreased in conjunction with the base price, thus resulting in lower net prices for Plaintiffs. Instead, during the relevant time period of Defendants' misconduct, the Midwest Premium soared to record levels.

158.    Plaintiffs' injuries arise from the competition-reducing aspect of Defendants' conduct. In the absence of such conduct, the LME warehouses would compete with one another with respect to offering efficient storage services. Aluminum would not stockpile at key

---

[44] *Goldman sells Colombia coal unit, ending physical commodity forays,* CNBC.com, http://www.cnbc.com/2015/08/14/goldman-sells-colombia-coal-unit-ending-physical-commodity-forays.html (last visited June 23, 2016, 12:45 PM).

chokepoint warehouses and freely tradable metal would be available from numerous warehouses, including without queues. This, in turn, would avoid the artificial increase in the Midwest Premium.

159.     At all times material to this Complaint, Plaintiffs have purchased primary aluminum directly from integrated producers and traders at prices that incorporated the Midwest Premium.

160.     Plaintiffs are efficient enforcers of the antitrust laws in that by paying artificially inflated aluminum prices directly to integrated producers and traders, Plaintiffs have suffered the most direct injury. As the direct and first-level purchasers of primary aluminum, and for their own industrial uses, Plaintiffs are the first payers of the inflated regional premiums, directly injured by inflated aluminum prices, and so are among the class of persons whose self-interest would motivate them to vindicate the public interest in antitrust enforcement.

161.     Plaintiffs remain the most efficient enforcer even compared to the producers because the producers' self-interest would not motivate them to file suit to enforce the antitrust laws and the producers do not pay the premiums. Plaintiffs' injuries are concrete and not speculative, being tied directly to the artificially-inflated Midwest Premium. Finally, as the direct purchasers of primary aluminum for their own use, there is no difficulty identifying or apportioning Plaintiffs' damages in this action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

162.     Plaintiffs reallege and reincorporate by reference the preceding allegations as though fully set forth herein.

163.    Beginning at a time unknown to Plaintiffs, but reasonably believed to be at or around the time of Goldman's acquisition of Metro in 2010 and continuing through the present, Defendants and their co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

164.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of aluminum for physical delivery by imposing supra-competitive regional premiums, including the Midwest Premium. Defendants' conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

165.    Defendants' conspiracy, and the resulting impact on the market for aluminum, occurred in and affected interstate commerce. Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

166.    The contract, combination or conspiracy has had the following effects, among others: (1) Prices charged to Plaintiffs for purchases of aluminum, particularly the regional premiums, including the Midwest Premium and other regional premium price terms, were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and (2) Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the market for aluminum.

167.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

168.     Plaintiffs are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Act alleged herein.

## SECOND CLAIM FOR RELIEF
## <u>VIOLATION OF THE NEW YORK DONNELLY ACT</u>

169.     To the extent not inconsistent with this Second Claim for Relief, Plaintiffs reallege and reincorporate by reference the preceding allegations as though fully set forth herein.

170.     Beginning at a time unknown to Plaintiffs, but reasonably believed to be at or around the time of Goldman's acquisition of Metro and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, agreement, arrangement or combination whereby competition or the free exercise of activity in the conduct of business, trade, or commerce in the state of New York is or has been restrained, in violation of the Donnelly Act (N.Y. G.B.L. § 340, et seq.).

171.     The contract, agreement, arrangement, or combination consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of aluminum for physical delivery by imposing supra-competitive regional premiums, including the Midwest Premium.

172.     Defendants' contract, agreement, arrangement or combination, and the resulting impact on the market for aluminum, occurred in and affected commerce in the state of New York.

173.     Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

53

174.     The contract, agreement, arrangement or combination has had the following

effects, among others: (1) Prices charged to Plaintiffs for purchases of aluminum, particularly

regional premiums, including the Midwest Premium and other regional price terms, were fixed

or stabilized at levels higher than the free market would have returned but for the manipulation;

and (2) Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition

in the market for aluminum.

175.     As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered

injury to their business or property.

176.     Pursuant to N.Y. G.B.L. §340(5), Plaintiffs are entitled to treble damages,

attorneys' fees, reasonable expenses, and cost of suit for the violations of law alleged herein.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE MICHIGAN ANTITRUST REFORMATION ACT

177.     To the extent not inconsistent with this Third Claim for Relief, Plaintiffs reallege

and reincorporate by reference the preceding allegations as though fully set forth herein.

178.     Beginning at a time unknown to Plaintiffs, but reasonably believed to be at or

around the time of Goldman's acquisition of Metro, and continuing through the present,

Defendants and their co-conspirators entered into and engaged in a conspiracy to restrain trade in

violation of the Michigan Antitrust Reformation Act (MCL § 445.772, et seq.).

179.     The conspiracy consisted of a continuing agreement, understanding, or concerted

action between and among Defendants and their co-conspirators in furtherance of which

Defendants artificially raised prices for purchases of aluminum for physical delivery by imposing

supra-competitive regional premiums, including the Midwest Premium.

180.     Defendants' conspiracy, and the resulting impact on the market for aluminum,

occurred in and affected commerce in the state of Michigan, including Plaintiffs' purchases of

aluminum. Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

181.    The contract, combination, or conspiracy has had the following effects, among others: (1) Prices given to Plaintiffs for purchases of aluminum, particularly the regional premiums, including the Midwest Premium price term, were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and (2) Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the market for aluminum.

182.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

183.    As a result of Defendants' violation of MCL § 445.772, Plaintiffs are entitled to treble damages, costs and reasonable attorneys' fees pursuant to MCL § 445.778.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE ILLINOIS ANTITRUST ACT
### (Brought by Reynolds Only)

184.    To the extent not inconsistent with this Fourth Claim for Relief, Plaintiff Reynolds realleges and reincorporates by reference the preceding allegations as though fully set forth herein.

185.    Beginning at a time unknown to Reynolds, but reasonably believed to be at or around the time of Goldman's acquisition of Metro, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a conspiracy to restrain trade in violation of the Illinois Antitrust Act (740 ILCS 10/3).

186.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of aluminum for physical delivery by imposing supra-competitive regional premiums, including the Midwest Premium.

187.    Defendants' conspiracy, and the resulting impact on the market for aluminum, occurred in and affected commerce in the state of Illinois, including Reynolds' purchases of aluminum. Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

188.    The contract, combination, or conspiracy has had the following effects, among others: (1) Prices given to Reynolds for purchases of aluminum, particularly the regional premiums, including the Midwest Premium price term, were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and (2) Reynolds has been deprived of the benefits of free, open, and unrestricted competition in the market for aluminum.

189.    As a proximate result of Defendants' unlawful conduct, Reynolds has suffered injury to its business or property.

190.    As a result of Defendants' violation of 740 ILCS 10/3, Reynolds is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 740 ILCS 10/7.

## FIFTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### (Brought by Reynolds Only)

191.     To the extent not inconsistent with this Fifth Claim for relief, Plaintiff Reynolds realleges and reincorporates by reference the preceding allegations as though fully set forth herein.

192.     In the alternative or in addition to the foregoing claims, Reynolds is entitled to recovery under Illinois state law for unjust enrichment.

193.     Defendants have unjustly retained benefits received, to the detriment of Reynolds. Defendants' unjust enrichment includes, but is not limited to, profits received by them as a result of their wrongful actions which caused Reynolds to pay inflated prices for aluminum purchases.

194.     As a direct result of Defendants' unjust enrichment, Reynolds has suffered an impoverishment and has been injured in its business or property.

195.     In the event Reynolds does not fully prevail on its other claims, no adequate remedy exists at law to allow Reynolds to seek restitution for its injuries.

196.     No justification exists for the Defendants receipt or retention of the unjust enrichment they have received as a result of their wrongful actions which directly injured Reynolds. Therefore, Reynolds is entitled to disgorgement of all profits resulting from the payment of inflated fees and prices for aluminum.

## SIXTH CLAIM FOR RELIEF
## VIOLATION OF The GEORGIA FAIR BUSINESS PRACTICES ACT
### (Brought by Southwire Only)

197.     To the extent not inconsistent with this Sixth Claim for relief, Plaintiff Southwire realleges and reincorporates by reference the preceding allegations as though fully set forth herein.

198.    Beginning at a time unknown to Southwire, but reasonably believed to be at or around the time of Goldman's acquisition of Metro, and continuing through the present, Defendants and their co-conspirators engaged in unfair and deceptive practices in their conduct of consumer transactions, in violation of the Georgia Fair Business Practices Act, (Ga. Code Ann. §10-1-393).

199.    The unfair and deceptive practices committed between and among Defendants and their co-conspirators, were done in furtherance of a conspiracy to artificially raise prices for purchases of aluminum for physical delivery by imposing supra-competitive regional premiums, including the Midwest Premium.

200.    Defendants' actions, and the resulting impact on the market for aluminum, occurred in and affected commerce in the state of Georgia, including Southwire's purchases of aluminum. Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

201.    The Defendants' unfair and deceptive practices in trade and commerce had the following effects, among others: (1) Prices given to Southwire for purchases of aluminum, particularly the regional premiums, including the Midwest Premium price term, were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and (2) Southwire has been deprived of the benefits of free, open, and unrestricted competition in the market for aluminum.

202.     Prices given to Southwire and other consumers for purchases of aluminum, particularly including the Midwest Premium price term, were fixed or stabilized at levels higher than the free market would have returned but for Defendants' price manipulation.

203.     Southwire has been deprived of the benefits of free, open, and unrestricted competition in the market for aluminum.

204.     As a proximate result of Defendants' unlawful conduct, Southwire has suffered injury to its business or property.

205.     As a result of Defendants' violation of Ga. Code Ann. §10-1-393, Southwire is entitled to treble damages, costs and reasonable attorneys' fees pursuant to §10-1-390, et. seq.

## SEVENTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### (Brought by Southwire Only)

206.     To the extent not inconsistent with this Seventh Claim for relief, Plaintiff Southwire realleges and reincorporates by reference the preceding allegations as though fully set forth herein.

207.     In the alternative or in addition to the foregoing claims, Plaintiff Southwire is entitled to recovery under Georgia State law for unjust enrichment.

208.     Defendants have received an identifiable benefit, namely, increased profits resulting from Defendants' unlawful actions which caused Southwire to pay inflated prices and costs for aluminum purchases.

209.     Receipt of the benefit came at no costs to Defendants, rather, it was a result of their unlawful conduct.

210.     In the event Southwire does not fully prevail on its other claims, no adequate remedy exists at law to allow Southwire to seek restitution for its injuries.

211.    No justification exists for the Defendants' retention of the unjust enrichment they have received as a result of their wrongful actions which directly injured Southwire. Therefore, Southwire is entitled to disgorgement of all profits resulting from the payment of inflated fees and prices for aluminum.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

(a)    Enter an order declaring that Defendants' actions as set forth in this Complaint, and in other respects, violate the law;

(b)    Award Plaintiffs damages in an amount according to proof against Defendants for Defendants' violation of 15 U.S.C. § 1, to be trebled in accordance with those laws;

(c)    Award Plaintiffs damages in an amount according to proof against Defendants for Defendants' violation of N.Y. G.B.L. § 340, et seq., to be trebled in accordance with those laws;

(d)    Award Plaintiffs damages in an amount according to proof against Defendants for Defendants' violation of M.C.L. § 445.772, et seq., to be trebled in accordance with those laws;

(e)    Award Plaintiff Reynolds damages in an amount according to proof against Defendants for Defendants' violations of 740 ILCS 10/3, to be trebled in accordance with those laws;

(f)    Award Plaintiff Reynolds damages in an amount according to proof against Defendants for Defendants' unjust enrichment in violation of Illinois state law;

(g)    Award Plaintiff Southwire damages in an amount according to proof against Defendants for Defendants' violations of the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-393, to be trebled in accordance with those laws;

(h)    Award Plaintiff Southwire damages in an amount according to proof against Defendants for Defendants' unjust enrichment in violation of Georgia state law;

(i)    Award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses; and

(j)    Award such other equitable and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated: July 26, 2016                              Respectfully submitted,

                                                 LOUIS F. BURKE, P.C.

                                                 By:  /s/Louis F. Burke
                                                       Louis F. Burke, Esq.
                                                 Leslie Wybiral, Esq.
                                                 460 Park Avenue, 21ST Floor
                                                 New York, NY 10022
                                                 Tel:  (212) 682-1700
                                                 Fax:  (212) 808-4280
                                                 lburke@lfblaw.com
                                                 lwybiral@lfblaw.com

                                                 *Attorneys for Plaintiffs*

                                                 HONIGMAN MILLER SCHWARTZ AND
                                                 COHEN LLP

                                                 Robert J. Palmersheim, Esq.
                                                 David E. Koropp, Esq.
                                                 Anand C. Mathew, Esq.
                                                 One South Wacker Drive, 28th Floor
                                                 Chicago, IL 60606
                                                 Tel: (312) 701-9339
                                                 Fax: (312) 701-9335
                                                 RPalmersheim@honigman.com
                                                 DKoropp@honigman.com
                                                 AMathew@honigman.com

                                                 *Attorneys for Plaintiffs*
                                                 *Pro Hac Vice Admission Pending*