**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

REYNOLDS CONSUMER PRODUCTS LLC; and
SOUTHWIRE COMPANY, LLC,

        Plaintiffs,

      v.

GLENCORE AG; GLENCORE, LTD.; GLENCORE
INTERNATIONAL AG; GOLDMAN SACHS &
CO.; GOLDMAN SACHS INTERNATIONAL;
HENRY BATH LLC; J. ARON & COMPANY;
JPMORGAN CHASE BANK, N.A.; JP MORGAN
SECURITIES PLC; METRO INTERNATIONAL
TRADE SERVICES, LLC; MITSI HOLDINGS LLC;
ACCESS WORLD (USA) LLC; ACCESS WORLD
AG; and ACCESS WORLD (VLISSINGEN) BV.

        Defendants.

Case No. 1:16-cv-5955 (KBF)

**DECLARATION OF LESLIE
WYBIRAL IN SUPPORT OF
PLAINTIFFS' MOTION TO
RECONSIDER THE COURT'S
OCTOBER 5, 2016 ORDER
DISMISSING PLAINTIFFS'
COMPLAINT AND AMEND
THE JUDGMENT**

LESLIE WYBIRAL declares pursuant to 28 U.S.C. §1746:

1.      I am over the age of 18 years and am not a party to the above-captioned case.  I am an attorney at the firm of Louis F. Burke, P.C., and am admitted to practice in the United States District Court for the Southern District of New York.  I am counsel for the Plaintiffs in this case, and I have personal knowledge of the facts set forth herein.

2.      Attached hereto as Exhibit A is a true and correct copy of the Amended Complaint that Plaintiffs intend to file in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, NY on October 19, 2016.           */s/Leslie Wybiral*
                                              Leslie Wybiral

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I certify under the laws of the United States of America that the foregoing is true and correct.

Dated: October 19, 2016
New York, New York

_____ */s/Leslie Wybiral* _____
Leslie Wybiral
LOUIS F. BURKE PC
460 Park Avenue, 21st Floor
New York, NY 10022
(212) 682-1700
lwybiral@lfblaw.com

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| REYNOLDS CONSUMER PRODUCTS LLC; and SOUTHWIRE COMPANY, LLC,<br><br>    Plaintiffs,<br><br>  v.<br><br>GLENCORE AG; GLENCORE, LTD.; GLENCORE INTERNATIONAL AG; GOLDMAN SACHS & CO.; GOLDMAN SACHS INTERNATIONAL; HENRY BATH LLC; J. ARON & COMPANY; JPMORGAN CHASE BANK, N.A.; JP MORGAN SECURITIES PLC; METRO INTERNATIONAL TRADE SERVICES, LLC; MITSI HOLDINGS LLC; ACCESS WORLD (USA) LLC; ACCESS WORLD AG; and ACCESS WORLD (VLISSINGEN) BV.<br><br>    Defendants. | Case No. 1:16-CV-5955<br><br>**FIRST AMENDED COMPLAINT**<br><br>**THE HONORABLE KATHERINE B. FORREST**<br><br>**JURY TRIAL DEMANDED** |

22901902.1

# Table of Contents

INTRODUCTION ...................................................................................................5

PARTIES ..............................................................................................................8

VENUE AND JURISDICTION ..........................................................................13

FACTUAL ALLEGATIONS ..............................................................................14

THE ALUMINUM MARKET ............................................................................14

    Properties & Uses .......................................................................................14

    Aluminum Production..................................................................................15

    Aluminum Supply And Demand .................................................................15

    The Primary Aluminum Market...................................................................16

    Primary Aluminum: Spot Prices and Their Link to Long-Term Supply Contracts...........17

    LME-Certified Warehouses ........................................................................19

DEFENDANTS CONSPIRE TO ARTIFICIALLY CONSTRAIN THE MARKET FOR PRIMARY ALUMINUM AND TO INFLATE THE MIDWEST PREMIUM ...........................22

    Defendant Banks Manipulate Spot Prices to Reap Profits in the Primary Aluminum Market......22

    Banks and Traders Take Control of the Primary Aluminum Market by Acquiring LME Warehouses......22

    Defendants Conspire To Restrict The Supply Of Primary Aluminum To Drive Up Prices......24

        *Defendants Violate The LME Information Barrier And Work Together To Carry Out The Conspiracy*......25

        *Defendants Agree Not To Compete With One Another in Their Warehousing Operations*......28

        *Defendants Stockpile Primary Aluminum To Create Excessively Long Queues*......29

            Defendants work around load out rules to minimize the amount of primary aluminum leaving their warehouses.......30

            Defendants offer incentive payments to attract more primary

22901902.1

aluminum to warehouses with long queues. .............................................32

Defendants work together to strategically cancel warrants and
concentrate stock at key warehouse locations. .........................................34

Defendants shuffle inventory between warehouses and work
together to prevent primary aluminum from becoming available. ...........39

Queues Rise Dramatically As The Amount Of Primary Aluminum Stored In LME
Warehouses Soars. .....................................................................................43

The Shortage Of Available Primary Aluminum Causes The Midwest Premium To
Dramatically Rise........................................................................................44

DEFENDANTS MANIPULATE THE MIDWEST PREMIUM AND REAP
SUPRACOMPETITIVE PROFITS FROM SALES OF PRIMARY ALUMINUM...................47

Defendants' trading operations involved the purchase and sale of primary
aluminum. ...................................................................................................47

Defendants Sell Their Warehouse Businesses Upon Investigatory Scrutiny. ..................50

PLAINTIFFS SUFFERED INJURY RESULTING FROM DEFENDANTS'
CONSPIRACY. ....................................................................................................53

CLAIMS FOR RELIEF ...............................................................................................54

FIRST CLAIM FOR RELIEF
VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 ..................54

SECOND CLAIM FOR RELIEF
VIOLATION OF THE NEW YORK DONNELLY ACT ............................................55

THIRD CLAIM FOR RELIEF
VIOLATION OF THE MICHIGAN ANTITRUST REFORMATION ACT ...............56

FOURTH CLAIM FOR RELIEF
VIOLATION OF THE ILLINOIS ANTITRUST ACT  (BROUGHT BY REYNOLDS
ONLY) ...................................................................................................................58

FIFTH CLAIM FOR RELIEF
UNJUST ENRICHMENT  (BROUGHT BY REYNOLDS ONLY) ...........................59

SIXTH CLAIM FOR RELIEF
VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
(BROUGHT BY SOUTHWIRE ONLY) ....................................................................60

SEVENTH CLAIM FOR RELIEF
UNJUST ENRICHMENT  (BROUGHT BY SOUTHWIRE ONLY) .........................61

22901902.1

REQUEST FOR RELIEF ..................................................................................................62

DEMAND FOR JURY TRIAL ........................................................................................63

Plaintiffs Southwire Company, LLC ("Southwire") and Reynolds Consumer Products LLC ("Reynolds") for their First Amended Complaint against Defendants, with knowledge as to their own actions and events, and upon information and belief as to other matters, allege as follows:[1]

## INTRODUCTION

1.      This case arises out of Defendants' deliberate and well-documented conspiracy to artificially increase the price of physical aluminum, and reap supracompetitive profits based on sales in the primary aluminum market.  Defendants, a combination of financial institutions, commodities traders, and aluminum warehouse operators, conspired to manipulate standard aluminum pricing components used throughout the industry in order to artificially raise the price of primary aluminum above competitive rates.

2.      Plaintiffs Southwire and Reynolds are large manufacturers of products that require enormous amounts of primary aluminum. Plaintiffs are consumers in the primary aluminum market, and as such, together purchased over one million metric tons of aluminum between 2011 and 2014.  Plaintiffs purchased a substantial amount of this aluminum directly from Defendant traders and co-conspirators Glencore, Ltd. and J. Aron & Company at supracompetitive prices due to Defendants' misconduct as outlined herein.  As a result, Southwire and Reynolds suffered substantial injury from Defendants' improper and illegal market manipulation and aluminum sales in the primary aluminum market.

---

[1] Plaintiffs' information and belief is based on their analysis of: (1) court documents filed or otherwise made public in current antitrust litigation against Defendants; (2) the 2014 Senate Subcommittee on Investigations report on Wall Street Bank Involvement with Physical Commodities (the "Senate Report", cited to herein as "S.R."); (3) publicly available news and media articles and investigations; and (4) other sources. Plaintiffs have been sent limited pleadings in the MDL litigation since filing their case, but have not received access to the vast majority of under seal filings, or any of the discovery exchanged, in the MDL litigation.   Thus, much of the underlying facts relating to Defendants' improper activities remains within the possession, custody, or control of Defendants and other insiders. Plaintiffs believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

3.      Southwire is North America's leading manufacturer of wire and cable used in the distribution and transmission of electricity. One in three new homes built in the United States uses Southwire wire. Southwire produces half of the cable used to transmit and distribute electricity throughout the United States. Southwire's wire also plays a key role in the manufacturing of other products, from automotive wiring harnesses to electrical motors to mining cable to insect screening.

4.      Reynolds is the owner of some of America's most trusted household product brands. The Reynolds line of products includes Reynolds Wrap® brand aluminum foil, private label rolled aluminum foil, and disposable aluminum bakeware.

5.      Southwire and Reynolds require primary aluminum to manufacture their respective products and procure it through long-term contracts with aluminum producers and traders. During the relevant time period, Southwire has purchased primary aluminum from, among others, Defendants Glencore, Ltd. and J. Aron & Company. Likewise, Reynolds has purchased primary aluminum from Defendant Glencore, Ltd.

6.      Southwire's and Reynolds' primary aluminum contracts use pricing terms comprised of two industry-standard elements: an amount known as the "LME Cash Price," plus an additional amount referred to as the "Platts' Midwest Premium." Because the LME Cash Price and the Platts' Midwest Premium are standard non-negotiable pricing components in the aluminum industry, Southwire and Reynolds are unable to reasonably procure primary aluminum in the United States that is not priced in this manner.

7.      Through their anticompetitive conduct, Defendants conspired to, and did, manipulate the Midwest Premium to inflate it beyond competitive levels. Defendants then

profited from their scheme by selling physical aluminum to Southwire, Reynolds and others at supracompetitive prices that incorporated this artificially inflated Midwest Premium.

8.     Defendant banks accomplished their scheme by acquiring 80 percent of LME-certified warehouses in the United States and the world. They then acquired and stored vast amounts of aluminum in their warehouses, and colluded to restrict the removal of primary aluminum from their warehouses and into the primary aluminum market. Defendants diverted aluminum to certain key warehouse locations, which caused the "queue" – the wait time for delivery of aluminum – to increase far beyond what it otherwise would have been were it not for Defendants' anticompetitive conduct. The queue for primary aluminum in the United States peaked at an astounding 674 days, up from only six weeks prior to Defendants' acquisition of LME warehouses.  This sudden and artificial supply restraint Defendants intentionally created caused the wait time for deliveries of primary aluminum to skyrocket, in turn causing the Midwest Premium to increase exponentially.

9.     As sellers in the primary aluminum market, Defendants profited from their scheme by selling primary aluminum to industrial users like Southwire and Reynolds at rates that incorporated the artificially high Midwest Premium. Defendants gained windfall profits as a result.

10.     Defendants' conspiracy involved a complex web of participation by both banks and affiliated warehouses, and crossed the boundaries of both horizontal and vertical affiliations. Banks conspired with other banks, warehouses conspired with other warehouses, and banks and warehouses conspired together, all in an effort to improperly and illegally raise prices for primary aluminum beyond competitive levels, and to profit from that fix through purchases made by Southwire and Reynolds, among others.

7

11.     Defendants' conspiracy caused Southwire, Reynolds, and other aluminum purchasers to pay millions of dollars in artificially inflated prices to acquire aluminum for their production needs. Between 2011 and 2014 alone, Southwire purchased over 650,000 metric tons ("MT") of aluminum at illegally inflated prices due to Defendants' misconduct. Over the same time period, Reynolds purchased over 380,000 MT of aluminum at anticompetitive prices due to Defendants' misconduct.

12.     Southwire and Reynolds bring this action to recover damages for injuries they sustained as a result of Defendants' violations of federal and state law.

## PARTIES

13.     **Southwire:** Southwire Company, LLC is North America's leading manufacturer of wire and cable used in the distribution and transmission of electricity. The company's headquarters are located at One Southwire Drive, Carrollton, Georgia 30119.

14.     **Reynolds:** Reynolds Consumer Products LLC is the owner of some of America's most trusted household products brands. The Reynolds line of products includes Reynolds Wrap® brand aluminum foil and Hefty® brand trash bags and disposable tableware. The company's headquarters are located at 1900 West Field Court, Lake Forest, Illinois 60045.

15.     **Goldman Sachs & Co.:** Defendant Goldman Sachs & Co. ("Goldman" or "Goldman Sachs") is an international financial company headquartered at 200 West Street, #200, New York, New York 10282. Goldman Sachs is a wholly owned subsidiary of The Goldman Sachs Group, Inc. Goldman Sachs & Co. traded aluminum and other base metals for itself as a principal and for its clients, including by trading in a variety of derivative products that derive their value from the underlying asset prices of aluminum. Goldman sold large amounts of physical, primary aluminum to industrial aluminum users in the United States during the relevant time period.

16.     **Goldman Sachs International:** Defendant Goldman Sachs International is an international financial services provider headquartered at Peterborough Court, 133 Fleet Street, London, EC4A 2BB, United Kingdom. According to regulatory filings with the Securities and Exchange Commission, Goldman Sachs International is a "significant subsidiary" of The Goldman Sachs Group, Inc., meaning that The Goldman Sachs Group, Inc. owns at least 99 percent of the voting securities of Goldman Sachs International. Goldman Sachs International conducts substantial and ongoing business in this District in its own right by virtue of its control and direction of the commodities trading desk of The Goldman Sachs Group in New York. Attendant to this business, Goldman Sachs International is also a registered swap dealer with the Commodities Futures Trading Commission ("CFTC").

17.     **J. Aron & Company:** Defendant J. Aron & Company ("J. Aron") is a New York company, commodities trading firm, and wholly owned subsidiary of The Goldman Sachs Group, Inc., with its principal place of business located at 200 West Street, New York, New York 10282, and additional offices in London and elsewhere around the world. J. Aron sold large amounts of physical, primary aluminum to industrial aluminum users in the United States, including directly to Southwire, during the relevant time period.

18.     Goldman Sachs & Co., Goldman Sachs International, and J. Aron collectively undertook the business of physical and derivative metal trading for the Goldman family, such that for purposes of pleading they should be viewed as one entity.

19.     **Metro International Trade Services LLC:** Defendant Metro International Trade Services LLC ("Metro") is a limited liability company organized under the laws of Michigan and headquartered at 2500 Enterprise Drive, Allen Park, MI, 48101.

20.     **MITSI Holdings LLC:** Mitsi Holdings LLC is a Delaware limited liability company and wholly-owned subsidiary of The Goldman Sachs Group, Inc. with its principal place of business located at 200 West Street, 29th Floor, New York, NY 10282. Mitsi Holdings LLC is the parent holding company of, with 100% ownership interest in, Defendant Metro International Trade Services LLC.

21.     **JPMorgan Chase Bank, N.A.:** Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") is a federally-chartered national banking association headquartered at 270 Park Avenue, New York, New York 10017, and a wholly-owned subsidiary of JPMorgan Chase & Co. JPMorgan conducts business within this District and owned billions of dollars in aluminum that was stored in warehouses during the relevant period. JPMorgan sold physical, primary aluminum to industrial aluminum users in the United States during the relevant time period.

22.     **JPMorgan Securities plc:** Defendant JPMorgan Securities plc ("JPMorgan Securities") provides securities brokerage services for JPMorgan, and is headquartered at 25 Bank Street, Canary Wharf, London E14 5JP, United Kingdom. Formerly JPMorgan Securities Ltd., JPMorgan Securities is one of the firm's "principal operating subsidiaries" according to SEC filings, and is a wholly owned subsidiary of JPMorgan. JPMorgan Securities engaged in aluminum transactions on behalf of itself and as an agent of JPMorgan, such that for purposes of pleading they should be viewed as one entity.

23.     **Henry Bath LLC:** Defendant Henry Bath LLC ("Henry Bath") is a limited liability company organized under the laws of Delaware and headquartered at 2500-A Broening Highway, Baltimore, Maryland 21224, and is a subsidiary of Henry Bath & Son, Ltd., a corporation organized under the laws of, and headquartered in, the United Kingdom. Henry Bath

owns and operates numerous aluminum warehouses in the United States, including in Chicago, Illinois; Baltimore, Maryland; and New Orleans, Louisiana.

24.    **Glencore, Ltd.:** Defendant Glencore, Ltd. ("Glencore") is a wholly owned subsidiary of Glencore plc (f/k/a Glencore Xstrata, plc), located at 301 Tresser Boulevard, Stamford, Connecticut 06901. Glencore Ltd. is an active trader of aluminum and sells large quantities of physical aluminum directly to large industrial users in the United States, including both Reynolds and Southwire. Glencore Ltd.'s U.S. traders conferred with traders for Glencore International AG or Glencore AG on certain deals. Glencore sold physical aluminum directly to industrial users in the United States, including to Southwire and Reynolds, during the relevant time period.

25.    **Glencore International AG:** Glencore International AG is a Swiss corporation with a business address at Baarermattstrasse 3, CH-6341 Baar, Zug Switzerland, and is a wholly-owned subsidiary and the primary operating company of Glencore plc (f/k/a Glencore Xstrata, plc). Glencore International AG's employees and agents regularly communicated with the employees and agents of the other Defendants, including Goldman Sachs, Metro, JPMorgan, Henry Bath, and Pacorini, concerning the storage of aluminum and the cancellation of aluminum warrants in the United States and Europe during the relevant period. Glencore International AG owned substantial quantities of aluminum that was stored in warehouses, including those owned by Metro, Pacorini, and Henry Bath. Glencore International AG transacted business in the United States both on its own and via Glencore, Ltd. during the relevant period.

26.    **Glencore AG:** Glencore AG is a Swiss corporation with a business address at Baarermattstrasse 3, CH-6341 Baar, Zug Switzerland, and is a wholly-owned subsidiary of Glencore International AG. Glencore AG's employees and agents regularly communicated with

the employees and agents of the other Defendants, including Goldman Sachs, Metro, JPMorgan, Henry Bath, and Pacorini, concerning the storage of aluminum and the cancellation of aluminum warrants in the United States and Europe during the relevant period. Glencore AG is the largest shareholder of Century Aluminum Company ("Century Aluminum"), one of the largest aluminum producers in the United States. It exercises significant control over Century Aluminum, occupying three seats on its board of directors, supplying the plant with alumina, and purchasing aluminum produced by the refinery. Southwire purchased substantial amounts of aluminum from Century Aluminum. Glencore AG also owns Allied Alumina Inc. (Sherwin Alumina) in Texas. Glencore AG owned substantial quantities of aluminum that was stored in warehouses, including those owned by Metro, Pacorini, and Henry Bath. Glencore AG transacted business in the United States both on its own and in conjunction with Glencore International AG and Glencore Ltd.

27.     **Access World (USA) LLC (f/k/a Pacorini Metals USA LLC):** Defendant Access World (USA) LLC is a limited liability company organized under the laws of Louisiana and domiciled at 520 Elmwood Park Boulevard, Suite 135, Jefferson, Louisiana 70123. Access World (USA) LLC was formerly known as Pacorini Metals USA, LLC and changed its name as of May 16, 2016. Access World (USA) LLC f/k/a Pacorini Metals USA LLC is referred to herein as "Pacorini." Pacorini owns and operates aluminum warehouses in the United States, including in Detroit, Michigan; Baltimore, Maryland; Chicago, Illinois; Los Angeles, California; Mobile, Alabama; and New Orleans, Louisiana.

28.     **Access World (Vlissingen) BV (f/k/a Pacorini Vlissingen BV):** Defendant Access World (Vlissingen) BV (f/k/a Pacorini Vlissingen BV) ("Pacorini BV") is a private limited liability company organized under the laws of the Kingdom of the Netherlands and

headquartered at Engelandweg 55 Port No. 1199 4389 PC, Vlissingen-Oost, Netherlands. It owns and operates LME-certified warehouses in Vlissingen, Netherlands that store aluminum.

29.     **Access World AG (f/k/a Pacorini Metals AG):** Pacorini and Pacorini BV are owned and controlled by Access World AG (f/k/a Pacorini Metals AG) ("Pacorini AG"). Pacorini AG is an entity organized under the laws of Switzerland with its principal place of business in Zug, Switzerland. Pacorini AG is owned and controlled by Glencore. One or more affiliates of Glencore International, Glencore AG, and Glencore Ltd. have been the owner of Pacorini USA, Pacorini AG, and Pacorini BV. Through this collective ownership, Glencore International AG, Glencore AG, and Glencore Ltd. exercised control over Pacorini's operations and collectively undertook the business of physical and derivative metal trading for the Glencore family, such that for purposes of pleading, they should be viewed as one entity.

## VENUE AND JURISDICTION

30.     This action is instituted against Defendants under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1337, Sections 4 and 16 of the Clayton Act, and 15 U.S.C. §§ 15(a) and 26.

31.     This Court may exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

32.     This Court has personal jurisdiction over each of the Defendants by virtue of their business activities in this State and by virtue of Defendants' participation in the conspiracy described herein. At all times material to this Amended Complaint, Defendants resided in, transacted business in, and/or committed acts in furtherance of the illegal conspiracy, within this

22901902.1

state. Those acts are attributable to all co-conspirators, as described herein. Further, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in this State, including injury to Plaintiffs.

33.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c) and (d), because, at all times material to this Amended Complaint, each Defendant resided, transacted business, or could be found in this District. The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have, direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## FACTUAL ALLEGATIONS

**THE ALUMINUM MARKET**

### Properties & Uses

34.     Aluminum is the most abundant metal found on Earth. It accounts for over eight percent of the Earth's crust. Because aluminum is highly reactive, it does not exist in the environment in its free form.

35.     Aluminum is lightweight, strong, corrosion-resistant, conductive, and durable. Its unique properties result in its use in the manufacture of a wide array of products, such as vehicles, packaging materials, construction materials, and consumer products. Because of its unique properties, there are few readily available substitutes for aluminum in most industrial applications.

36.     Southwire uses aluminum to manufacture a wide range of products including building wire and cable, electrical transmission cable, and other types of wiring and cable. Because of aluminum's unique physical properties, Southwire has no reasonably available substitutes that it can use to produce its products.

14

37.     Reynolds uses aluminum to manufacture a wide range of products including Reynolds Wrap® brand aluminum foil, private label rolled aluminum foil, and disposable aluminum bakeware. Because of aluminum's unique physical properties, Reynolds has no reasonably available substitutes that it can use to produce its products.

**Aluminum Production**

38.     Primary aluminum refers to the process by which new aluminum is made from the mining of bauxite ore. Bauxite ore is refined to extract alumina. Alumina is then shipped to a primary aluminum plant (or smelter) where aluminum is extracted from the alumina. Molten aluminum can then be alloyed and cast into various shapes, such as ingots, billets, sows, sheets, rolls, and other forms.

39.     Primary aluminum generally consists of  P1020 aluminum, which is 99.7 percent pure aluminum cast as standard ingots, t-bars, or sows, which can be readily re-melted and fabricated into other forms of aluminum. P1020 aluminum is tradable commodity grade aluminum and is the grade upon which all other aluminum is priced.

**Aluminum Supply And Demand**

40.     The demand for primary aluminum is generally inelastic.  This lack of sensitivity to price for many manufacturers is due to numerous factors, including the fact that, in many products (such as those made by Southwire and Reynolds), there simply is no substitute whatsoever for primary aluminum, while in other products, their specifications and design do not easily allow for substitution of materials absent a major, cost-prohibitive redesign. As prices change, manufacturers such as Southwire and Reynolds who use primary aluminum will not substitute away from it enough to eliminate the profit opportunity achieved by raising the price. Exaggerating the price inelasticity as to Plaintiffs is the fact that *their* customers may substitute away from their products. For example, if Reynolds were to pass along a price increase for

15

Reynolds aluminum wrap, Reynolds' customers may switch from aluminum foil to plasticware. If Southwire were to similarly pass along a price increase, its customers may outfit their homes with copper wiring instead of aluminum wiring.  From the demand side, an increase in price, if achievable, will increase profits to those with primary aluminum to sell.

41.     The primary aluminum industry adjusts slowly because of the very long lead times required to add primary aluminum production capacity. Economists at the Department of Justice ("DOJ") determined that it takes approximately six years for the primary aluminum industry to respond to shocks that would call for a restructure of the industry. The production of primary aluminum is inelastic over a span of six or more years because primary aluminum producers tend to maintain active smelters running at high capacity, and because it takes about six years to bring a new primary aluminum smelter on-line.  In many cases, shutdown and startup costs are large, making the decision to keep a smelter running a function of not only the cost of the inputs directly attributable to output, but also of the costs required to stop production and potentially restart.

42.     This inelasticity means that price changes in the market for primary aluminum due to demand shifts will have relatively little effect on the volume of primary aluminum produced. Further, any change in the amount of primary aluminum available to the market will cause a large change in price as consumers have a low long-run elasticity, and the supply elasticity takes six or more years to achieve.

**The Primary Aluminum Market**

43.     As alleged above, primary aluminum has unique properties coveted by manufacturers of products containing primary aluminum, including Southwire and Reynolds. The primary aluminum products manufactured by Southwire, Reynolds, and other similarly situated manufacturers have specifications that do not reasonably allow for a change of materials.

16

Thus, primary aluminum exhibits demand inelasticity. A small but significant increase in the price of primary aluminum does not lead to substitution. Based on these factors, Plaintiffs allege that the market for primary aluminum can be considered a relevant product market.

44.     The relevant geographic market is at least as large as the United States and Canada. The vast majority of primary aluminum purchased in the United States is either produced domestically or imported from Canada. The origin of primary aluminum imports into the United States is determined by relative transport costs to alternative destinations. Thus, due to transport costs, duties, and tariffs, primary aluminum purchasers in the United States turn to suppliers in the United States and Canada to meet their demand.

**Primary Aluminum: Spot Prices and Their Link to Long-Term Supply Contracts.**

45.     The London Metal Exchange Ltd. ("LME") is a private trade association and the world's largest non-ferrous metals market. More than 80 percent of all global non-ferrous metal futures business is transacted through its trading platforms. The vast majority of primary aluminum trading activity on the LME takes place among banks, hedge funds, and traders, rather than actual users of primary aluminum.

46.     The LME determines a daily cash price (the "LME Cash Price") for spot primary aluminum through open outcry by the marginal buyer and seller at a specific moment in time using standardized LME contracts covering spot material located in LME-certified warehouses. The LME thus provides a price discovery mechanism for a standard primary aluminum exchange contract throughout the world. While the LME Cash Price is a global price, it does not include transportation and delivery costs.

47.     Contracts for the supply of primary aluminum, like those used by Southwire and Reynolds, invariably incorporate an applicable regional premium. These regional premiums are determined based on physical spot deals as well as a daily survey of bids and offers from buyers

17

and sellers. These regional premiums reflect current offers for primary aluminum available immediately for delivery, and incorporate the fluctuating transportation, delivery, storage, finance, and insurance costs incurred by the various suppliers of primary aluminum. The regional premiums are published by private companies, including Platts Metal Bulletin.

48.     In the United States, the regional premium is referred to as the Platts' Midwest Premium (the "Midwest Premium"). Notwithstanding the limitation implied by its name, the Midwest Premium is charged throughout the United States (and sometimes abroad). The Midwest Premium "incorporates supply and demand of the North American-specific market to complement the LME aluminum contract."[2] Together, the LME Cash Price and the Midwest Premium are referred to as the "Midwest Transaction Price," or "all-in" price, for physical delivery of primary aluminum.

49.     There are other premiums, including the Rotterdam Premium (applied primarily in Europe) and CIF Japan Premium (applied primarily in Japan and other parts of the Far East). However, because industrial contracts for physical delivery of aluminum express the price using the LME Cash Price, which is a global price, regional premiums tend to move up and down together. If they did not, multinational primary aluminum purchasers, traders, and arbitrageurs could exploit pricing differences among regional premiums.

50.     Industrial users such as Southwire and Reynolds purchase the vast majority of their primary aluminum pursuant to long-term supply arrangements rather than on the spot market. However, the pricing of primary aluminum for long-term industrial supply contracts, such as those that Southwire and Reynolds enter into, is dependent on the supply and demand in

---

[2] Investor Relations, CME Group, http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID= 784335 (last visited June 23, 2016, 11:37 AM).

the LME warehouses, as well as the immediate availability of primary aluminum for delivery. As the LME has stated, "[a]lthough the physical metal will never pass through the LME network or LME warehouses, the balance of trade does impact LME volumes and prices through the hedge which will likely be transacted by the counterparties to hedge their LME price risk."[3]

51.     Accordingly, during all times material to this Amended Complaint, Southwire and Reynolds purchased their primary aluminum pursuant to supply contracts that expressly incorporated the LME Cash Price and the Midwest Premium as pricing elements. Southwire and Reynolds could not reasonably procure primary aluminum from suppliers, whether on a spot or yearly basis, without paying the Midwest Premium. Defendants were well aware of these facts during the relevant time period.

52.     Combined, Southwire and Reynolds purchased over 1 million MT of primary aluminum between 2011 and 2014. Plaintiffs purchased substantial amounts of this primary aluminum directly from Glencore Ltd. Southwire also purchased primary aluminum directly from J. Aron.

**LME-Certified Warehouses**

53.     The LME certifies and purports to supervise a global network of more than 700 warehouses for the storage of metals. The LME authorizes warehouse companies and the warehouses they operate to store LME-registered brands of metal, on behalf of warrant holders, and issue LME warrants through their London agent for material delivered into their approved

---

[3] Summary Public Report of the LME Warehousing Consultation at 36 (Nov. 2013), *available at* https://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/Public%20Report%20of%20the%20 LME%20Warehousing%20Consultation.pdf

22901902.1

warehouses. The LME describes these locations as "areas of net consumption and logistical hubs for the transportation of material."[4]

54.     Defendants Metro, Henry Bath, and Pacorini collectively own and operate more than 80% of the LME-certified warehouses in the United States and throughout the world. In the United States, Metro operates LME-certified warehouses in Detroit, Toledo, Chicago, Mobile, and New Orleans. Pacorini operates in Detroit, Baltimore, Chicago, New Orleans, Mobile, and Los Angeles. Henry Bath operates in Baltimore, Chicago, and New Orleans.

55.     Upon delivery of a lot of primary aluminum into an LME warehouse, the warehouse issues an LME warrant, which is a standardized document indicating who has the right to possess that lot of primary aluminum. LME warrants are freely tradable and are the actual instrument that underpins a highly leveraged volume of LME paper futures transactions. The LME warrant is considered first-class collateral. The holder of an LME warrant can borrow money secured by that warrant on favorable terms. Thus, LME warrants allow persons to convert primary aluminum into tradable warrants exchangeable for cash or deliverable against trading positions.

56.     Under LME futures contracts, delivery of a warrant represents delivery of the corresponding quantity of primary aluminum. When, at their expiration, a forward contract or futures contract prices move into line with the prices for the physical commodity, it is referred to as "convergence."

57.     The LME-certified warehouses are a critical part of the supply chain for primary aluminum in the United States (and globally) because, among other things, it is only in such

---

[4] *Warehousing and Brands*, LME.Com, https://www.lme.com/en-gb/trading/warehousing-and-brands/ (last visited June 23, 2016, 11:43 AM).

22901902.1

warehouses that LME warrants can be issued and canceled. Thus, the LME-certified warehouse market functions on a global basis with distinct regions in North America, Europe, and Asia.

58.     LME warehouses are vital links in the primary aluminum supply chain for another reason. During a deficit primary aluminum market, they represent a major source for primary aluminum for primary aluminum consumers. During a surplus primary aluminum market, as during the times material to this Amended Complaint, they represent a major destination for primary aluminum producers who need to keep their plants operating and raise cash.

59.     In this and other ways, the price-neutral conduct of the LME warehouses achieved price convergence and made the LME forward contracts attractive both to industrial consumers and aluminum producers. Thus, from 1989 until around 2009, the LME's warehouses fulfilled the LME's represented mission of a major price-neutral storage place. During this time consumers were able to acquire primary aluminum at prices dictated by an open, fair, and free-flowing market.

60.     The LME itself describes its "functions of trading and price discovery [as] underpinned by a global network of approved warehouses and storage facilities as well as approved brands," and notes that "[w]hile delivery occurs in only a very small percentage of LME trades, the possibility of physical settlement plays a vital role in creating price convergence and ensuring our prices closely align with that of the physical spot market."[5]

---

[5] *Id.*

**DEFENDANTS CONSPIRE TO ARTIFICIALLY CONSTRAIN THE MARKET FOR PRIMARY ALUMINUM AND TO INFLATE THE MIDWEST PREMIUM**

**Defendant Banks Manipulate Spot Prices to Reap Profits in the Primary Aluminum Market**

61.     As explained in greater detail below, Defendant banks conspired to, and did, artificially raise the Midwest Premium. They did this by consciously and collaboratively acquiring LME warehouses, and then purchasing and amassing enormous volumes of primary aluminum in those warehouses, and colluding to restrict the removal of primary aluminum from their warehouses. This supply restraint caused the Midwest Premium, and the long-term contract prices for primary aluminum that were based on it, to skyrocket.

62.     Defendants benefitted from this conspiracy in multiple ways.  First, Defendants Glencore, JPM, and Goldman Sachs each had or amassed enormous quantities of physical aluminum during the time in question.  As a result of their actions, they were able to sell aluminum in the spot market and charge the inflated price, including in transactions where Defendants, themselves, did not pay the Midwest Premium. Additionally, they benefited from the value of their increased holdings, and the margins on these holdings they earned in transactions with Plaintiffs.  Second, Defendants' price manipulation increased the long-running financial contango, making certain transactions more profitable for Defendants' sophisticated metals trading operations.

**Banks and Traders Take Control of the Primary Aluminum Market by Acquiring LME Warehouses**

63.     Beginning in early 2010, large banks, such as Defendants JPMorgan and Goldman acquired LME warehouses that were critical to the determination of the Midwest Premium. Acquiring these particular LME warehouses enabled Defendant banks to distort the

primary aluminum market through collusion that restricted withdrawal rates of primary aluminum from their warehouses, which artificially increased the Midwest Premium. to

64.    In February 2010, Defendant Goldman acquired Defendant Metro. Metro owns and operates numerous LME-certified warehouses in the United States, including several warehouses in or around Detroit, Michigan; Chicago, Illinois; Long Beach, California; Mobile, Alabama; New Orleans, Louisiana; St. Louis, Missouri; and Toledo, Ohio that store primary aluminum.

65.    In July 2010, Defendant JPMorgan acquired Defendant Henry Bath. Henry Bath is one of the oldest warehouse operators in the world and a founding member of the LME. As a founding member of the LME, it is one of only 11 "ring-dealing" members allowed to trade in open outcry auctions on the LME floor. The company also holds a seat on the LME Warehousing Committee, a select group charged with establishing the rules for LME regulated warehouses. Henry Bath owns and operates numerous LME-certified warehouses in the United States, including warehouses in Chicago, Illinois; Baltimore, Maryland; and New Orleans, Louisiana that store primary aluminum.

66.    Following JPMorgan's July 2010 warehouse acquisition, the head of JPMorgan's commodities business, Blythe Masters, admitted that "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture . . . . We need to be active in the underlying physical commodity markets in order to understand and make prices."[6]

---

[6] *Wall St falls out of love with commodities trading*, Financial Times, https://next.ft.com/content/4d1f8f7a-faf0-11e2-87b9-00144feabdc0 (last visited June 23, 2016, 11:48 AM).

67.     In September 2010, Defendant Glencore acquired Defendant Pacorini. Glencore is a commodities trading and mining company that engages in the production, storage, transportation, marketing, or trading of primary aluminum as well as trading derivative products that derive their value from the underlying asset prices of primary aluminum. Pacorini owns and operates LME-certified warehouses in the United States, including warehouses in Detroit, Michigan; Baltimore, Maryland; Chicago, Illinois; Los Angeles, California; Mobile, Alabama; and New Orleans, Louisiana that store primary aluminum.

68.     Metro, Henry Bath, and Pacorini collectively operate more than 80 percent of the LME-certified warehouses in the United States and throughout the world. Thus, with these acquisitions, Defendants gained control over the key LME warehouses. Defendants' goal was not simply just to participate in the primary aluminum market but, in the words of JPMorgan, to "be active in the underlying physical commodity markets in order to understand and make prices."[7]

**Defendants Conspire To Restrict The Supply Of Primary Aluminum To Drive Up Prices.**

69.     Shortly after acquiring control of the LME-warehousing network, Defendants and their co-conspirators began engaging in a series of concerted actions designed to artificially increase the Midwest Premium and reap increased profits, all at the expense of Plaintiffs and other consumers.

70.     Defendants intentionally and artificially drove up the Midwest Premium through a series of actions which included, but were not limited to: violating the LME Information Barrier rules, agreeing not to compete with one another, stockpiling primary aluminum at key LME

---

[7] *Id.*

warehouses, and creating excessively long queues to unload primary aluminum for the purpose of artificially driving up prices.

### Defendants Violate The LME Information Barrier And Work Together To Carry Out The Conspiracy.

71.     The degree of coordination between Defendants spans both vertical and horizontal junction points of the primary aluminum market.  First and most directly, the coordination between commodities trading desks and their affiliated warehousing companies (e.g., Goldman and Metro, JP Morgan and Henry Bath, Glencore and Pacorini) was wide-sweeping and broad.

72.     At all times material to this Amended Complaint, the LME has had in effect certain "Information Barrier" rules relating to the sharing of confidential information between LME members and related warehouse companies. These rules are designed to maintain the integrity of the market for primary aluminum by preventing the sharing of information relating to the identity of warehouse customers, sensitive pricing information, and certain non-public information about inbound and outbound metal at LME warehouses. The LME rules specifically state that "it is essential that personnel engaged in trading activities in relation to the LME market do not come into possession of any Confidential Information."[8]

73.     Defendants frequently violated the LME Information Barrier by placing bank executives in key positions to receive confidential and valuable information they generally were not permitted to receive.

74.     After acquiring Metro, Goldman installed an entirely new Board of Directors for Metro, comprised entirely of Goldman employees. These board members regularly received

---

[8] S.R. at 226. Available at: http://www.hsgac.senate.gov/subcommittees/investigations/hearings/wall-street-bank-involvement-with-physical-commodities-day-one

valuable and confidential information about Metro.[9] Nearly 50 Goldman employees, including executives and traders, had access to this information. For example, Scott Evans, a senior trader for the physical metals desk within the Commodities Division of Goldman Sachs International and/or with Goldman's J. Aron trading division, was responsible for dealing directly with Metro on behalf of Goldman Sachs. He received trading information from Metro, including advice on bids Goldman Sachs should place on Glencore metal.

75.     Similarly, Stephen Branton-Speak, a former partner at Goldman Sachs International who presided over the formation and management of the physical-metals trading desk within the Commodities Division of Goldman Sachs International and was an LME board member, initiated an email chain with Jacques Gabillon, a Managing Director at Goldman Sachs International and the Head of Global Commodities Principal Investments, and also the Chairman of the Board and Board Member of MITSI Holdings LLC, about a deal Metro was not paying enough to win. Branton-Speak asked whether Gabillon was "Happy to lose this one?" prompting Gabillon to forward the email to Wibbelman who said he was holding at 125.5 (50 cents above highest ever). "Scott said that on several previous deals too, and we got it at my number. I could look silly if I lose 90,000 tons for a few bucks. But we are being worked by Alcoa. And by GS. And by all other customers. It is hard to hold firm." Gabillon then passed along that "Steve saying he is going to pass then, whatever that means." Wibbelman noted that the "Midwest [premium] US is 6.35 cents/lb so, 139 days with 30 days credit and credit risk. But the premium will go down if we force it there. Also, Metal Bulletin and European Economics would notice 130. Steve can always buy it and earn contango until he delivers it to us. (Which I know is not as good for us but points out that I am not the only one letting it go for a few dollars)." Gabillon

---

[9] S.R. at 220.

asks what would happen if Metro just bid $100. "They would sit on it and wait for spot commitments. By selling, premiums would come down though. No warehouse can bid that much but us . . . ." Wibbelman later comments: "***What is true though, is that the metal we get is withheld from consumers and makes the premium go up*** . . . which provides a competitive alternate to customer." This shows not only illicit communication between Goldman's traders and Metro (with specific communication about whether or not a deal would be transacted based on what should be confidential pricing information), but also that Metro knows very well what the Midwest Premium measures at for any given time and how its freight incentive interacts with this premium. Metro knows that metal it gets is "withheld from consumers and makes the premium go up."

76.     Defendants openly mocked the information barrier. On July 20, 2010, Wibbelman sent an email to Gabillon stating, "Second source confirms its Glencore." Gabillon, who was with Evans at the time, began the following exchange:

> Gabillon:     You called Scott while I am having dinner with him ????
>
> Wibbelman:   There is a large bread basket that constitutes a Chinese Wall.
>
> Gabillon:     Massive basket but wine flowing courtesy of steve . . . Negotiating freight incentive now!

77.     Three days later, Evans emailed Wibbelman and Branton-Speak, among other Goldman employees, and stated: "thanks for your support on this first transaction, looking forward to many more." The email sets out details of a transaction to warrant for J. Aron for 24,000 tons of primary aluminum coming from Chicago, with freight incentives.

78.     Goldman communicated constantly with Metro in part because Goldman allowed Metro very little authority. On information and belief, Metro often had to seek authorization from Goldman to execute routine warehousing transactions, including to offer specified

incentives for storage deals. For example, in an email chain entitled "Authority Approval Request," Wibbelman sought Goldman's authority "to rent deal all or substantially all of our Mobile Aluminum to JPMorgan."

79.     The information barrier fared no better at JPMorgan and Henry Bath, as suggested by the fact that Peter Sellars was both JPMorgan's Head of Global Metals of the Global Commodities Group, Chairman of the Board, and also a director of Henry Bath & Son, Ltd. Moreover, JPMorgan personnel communicated directly with Henry Bath personnel regarding metal releases and rents.

80.     JPMorgan Securities transacted directly with Metro regarding primary aluminum storage in the United States on a deeply involved and continuing basis – so much so that Sellars communicated directly with Wibbelman, about their business together.

81.     Defendants shared among themselves what should have been confidential, competitive freight incentive information. For example, on one occasion, Metro's CEO noted competitive information received from Pacorini regarding freight and incentive prices.

### *Defendants Agree Not To Compete With One Another in Their Warehousing Operations*

82.     Once Defendants had obtained control of the LME warehousing network, they agreed that their respective primary aluminum warehousing operations would work together and not compete against each other. Defendants used the very transparent LME exchange and its warehouse system as the mechanism to coordinate their collusive agreement, to monitor the behavior of the collusive group, to limit the ability (and temptation) of the collusive group to cheat, and to lock in collusive profits.

83.     For example, Goldman/Metro and Glencore/Pacorini agreed to allocate the key primary aluminum warehousing cities of Detroit and Vlissingen, Netherlands, between

22901902.1

themselves. When Metro began to run out of warehouse space in Detroit, Pacorini offered to lease Metro space rather than compete against it. Upon information and belief, an internal Metro email noted that Pacorini "have maintained all along that they have no desire to nitpick us in Detroit otherwise Glencore would have done this long ago. Besides they know we [Goldman/Metro] would retaliate incrementally in some place like Vlissingen." This email demonstrates market allocation among Defendants: the co-conspirator Defendants knew that if one of them violated the conspiratorial agreement, the others could retaliate in key locations such as Glencore and Pacorini's operations in Vlissingen.

84.     Metro also understood that JPMorgan's Henry Bath warehousing operations would not compete with it. At a March 11, 2010 Board meeting for MITSI Holdings, LLC, Wibbelman offered that he did not believe that Sellars had taken "a predatory view of the warehouse business in the past" and hoped it "would continue when he became the Global Head of Metals at JPM."

85.     Metro gave JPMorgan preferential treatment in its warehousing queues. In September 2010, Metro loaded out aluminum owned by JPMorgan by moving its position in the queue ahead of metal warranted to other owners.

### Defendants Stockpile Primary Aluminum To Create Excessively Long Queues.

86.     After agreeing not to compete against one another, Defendants worked with each other to stockpile primary aluminum at key LME locations. Defendants did this by: (1) working around LME load out rules to minimize the amount of primary aluminum that left their affiliated warehouses; (2) offering incentive payments for primary aluminum owners to store primary aluminum at warehouses with queues; (3) strategically canceling warrants; and (4) shuffling primary aluminum among their warehouses rather than releasing it to the public.

29

**Defendants work around load out rules to minimize the amount of primary aluminum leaving their warehouses.**

87.     A large part of Defendants' conspiracy required working around LME load out regulations which obligated each warehousing company to load out a minimum of 1,500 MT per day per location.

88.     However, the load out requirement was per company and not per warehouse. If a company owned multiple warehouses in one city (for example, Metro's several warehouses in Detroit), all those warehouses together would need to load out only 1,500 MT per day.

89.     The minimum load-out was far less than the amount Defendants' warehouses could load out if they were attempting to operate their warehouses with the goal of efficiency, rather than market manipulation. It has been estimated that each warehouse using only two forklifts could load out as much as 1,920 MT per day. Thus, for example, the Metro warehouses in Detroit (which, by one count, numbered 27) could collectively deliver in excess of 50,000 MT per day, rather than the 1,500 MT minimum that they treated as a daily maximum load out.

90.     Despite the huge quantity of primary aluminum stored in the LME warehouses, the loading out rate prior to April 2012 was, on most days, barely above the then-required minimum under LME rules, 1,500 MT per day per company per city for the largest warehouses. The purported minimum LME primary aluminum loading-out rate therefore operated as a *de facto* uniform or maximum load-out rate. On information and belief, an internal Goldman document spells out that Goldman, Metro, and others in the industry treated the loadout minimum as a *de facto* maximum.

91.     As a result of the warehouses' excessively (and intentionally) slow loading-out rates, lengthy and persistent queues of over one year developed for delivery of primary aluminum.

22901902.1

92.     Defendants were well aware of the relationship between the LME load-out requirement and the effect the long queues had on the Midwest Premium.[10] For instance, on June 21, 2010, Metro's CEO Wibbelman emailed a colleague at Metro to convey a message at an upcoming steel conference:

> That, outbound shipment at the scale indicated would be detrimental to the LME warehouse system and the LME's market share and success. Detrimental to the producers, detrimental to the premium, detrimental to the price, detrimental to the contango, detrimental to the amount of stock on LME (so detrimental to transparency and liquidity).

With this, Wibbelman specifically noted that a higher load-out requirement will push down the Midwest Premium and will diminish traders' opportunities for contango trades.[11]

93.     In a December 2010 email, Wibbelman explained how Defendants working together as a cartel accomplished their scheme: "physical traders in conjunction with banks and producers hold [primary aluminum] stock and withhold metal sales to consumers in order to squeeze up the premiums."

94.     As the Senate Report noted, "[i]f a bank's affiliate owns or controls a metals warehouse…the bank has the means to affect the marginal supply of a commodity and can use those means to benefit the bank's physical or financial commodities trading positions."[12]

---

[10]   Moreover, upon information and belief, Metro and Goldman privately lobbied the LME as part of their "strategy for defending 1500mt/day" and "struggling to maintain the status quo." Throughout the LME rule-making process for new load-in rates, Goldman and Metro provided steady input to the LME, which was always considered and frequently accepted.

[11]   Contango results when the futures or forward price of a commodity is higher than the expected spot price.

[12]   S.R. at 38.

**Defendants offer incentive payments to attract more primary aluminum to warehouses with long queues.**

95.     Defendants also ensured that their warehouse inventories remained high by offering anticompetitive incentives to primary aluminum producers and traders to deposit primary aluminum in their warehouses, and to primary aluminum warrant owners to continue to store primary aluminum in their warehouses. Such incentive payments indicate market manipulation in the current context.

96.     *The New York Times* reported that Defendant Metro offered owners incentive payments of up to $230 a ton to continue to store their primary aluminum at Metro warehouses.[13]

97.     Defendant Glencore engaged in the same conduct in Vlissingen. According to Reuters, quoting a London-based trader: "Fresh material is being bid slightly because Pacorini are paying big incentives to get metal there, in Vlissingen. Then they deliver it to the market and whoever holds it can't actually get it out for a year."[14]

98.     These incentive payments have, moreover, been paid by the strategic chokepoint warehouses, e.g., Metro in Detroit and Pacorini in Vlissingen, as a means to attract primary aluminum to particular warehouses where existing and growing queues were thereby exacerbated in order to drive up the Midwest Premium.

99.     Goldman and Metro understood that they could pay higher incentives to attract primary aluminum into warehouse locations with queues. Metro differentiated among its warehouse locations when deciding how much it could or would pay as a freight incentive or

---

[13]     David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).
[14]     Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*, CHICAGO TRIBUNE (April 27, 2012).

other warranting specifics.  It is reasonable to assume the other Defendants, who were experienced traders and warehouse operators, would have the same understanding.

100.    In its Summary Public Report of the LME Warehousing Consultation dated November 2013 (after its acquisition by non-defendant, Hong Kong Exchange), the LME stated that it "considers the fundamental role of the queues is to increase premiums, [and] it must follow the most logical course of action is to address the existence of those queues."[15]

101.    Defendants used the LME warehouses as the mechanism to facilitate their collusive agreement. Once primary aluminum was put into the LME warehouses, volumes of primary aluminum inventories could be verified as warrants were confirmed. The speed at which primary aluminum was removed from the warehouse was slowed, and at the same time, the collusive parties were able to lock in profits while not allowing the primary aluminum to actually reach the physical market due to a year or more delay in load out. This also led to longer storage times and therefore, higher overall storage fees.

102.    On information and belief, Defendants actually met and discussed their inducement payments on at least one occasion as part of an LME warehouse committee meeting on March 13, 2012. The LME warehouse committee minutes noted that "exceptional inducements" could "have the effect of constraining the market." The minutes further state, "A discussion followed regarding inducements and what was an acceptable level, however no consensus was reached and differing opinions were given as to why inducements occurred and at what level." Thus, using the LME, Defendants were able to freely discuss what inducement they were paying at what locations to further their ability to move metal into key locations.

---

[15] *Summary Public Report of the LME Warehousing Consultation*, LME.com, https://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/Public%20Report%20of%20the%20LME%20Warehousing%20Consultation.pdf. (last visited June 23, 2016, 12:01 PM).

**Defendants work together to strategically cancel warrants and concentrate stock at key warehouse locations.**

103.    To issue a warrant means that primary aluminum has been checked into a warehouse for storage, and to cancel a warrant means that a request has been made for delivery of the aluminum from the warehouse. A queue forms when primary aluminum owners request actual, physical delivery of their primary aluminum at a rate greater than the LME's daily load-out requirement.[16]

104.    Warrant cancellation activity began to increase once Goldman Sachs, JPMorgan, and Glencore purchased their LME warehouses, and exploded at the end of 2011, once the scheme set forth above was fully in place.

105.    Upon information and belief, these levels of warrant cancellations by Defendants had nothing to do with the actual need for physical deliveries of primary aluminum and everything to do with creating artificially-increased load out queues.  These increased load out queues in turn caused regional premiums, including the Midwest Premium, to increase far more than they otherwise would have were it not for Defendants' unlawful conduct. As a result, customers like Southwire and Reynolds paid far more for primary aluminum than they otherwise would have paid.

106.    According to the trade publication American Metals Market in a February 4, 2011 report:

> A sharp increase in canceled aluminum warrants in London Metal Exchange-registered warehouses in Detroit is part of a "revenue game" and not a true reflection of physical demand, market sources told AMM Friday. Canceled warrants in Detroit jumped by nearly 45,000 tonnes overnight to 79,125 tonnes Thursday, rekindling the finger-pointing that followed September's 100,00-

---

[16] S.R. at 191

> tonne increase and igniting chatter from traders about the real motives behind the move. A number of traders said the cancellations could be little more than "warehousing games," where one player cancels warrants to increase the queue at a warehouse.

107. In September 2010, Metro was involved in creating large warrant cancelations at its Detroit warehouse. That same month, JPMorgan canceled warrants in Detroit. The purpose and effect of these cancellations was to lengthen the queue, rather than any legitimate, pro-competitive purpose. Similarly, in December 2011, JPMorgan and Glencore entered into an unusually large primary aluminum swap involving Pacorini BV's Vlissingen and Metro's Detroit warehouses. Under the agreement, JPMorgan gave 860,000 MT of primary aluminum located in Metro's Detroit warehouse to Glencore International AG. Glencore International AG gave JPMorgan 860,000 MT of primary aluminum located in Pacorini's Vlissingen warehouse. The 1.72 million MT involved represented over a third of global LME primary aluminum stocks.

108. Once the swap was completed, JPMorgan immediately canceled warrants for 500,000 MT of primary aluminum that it had acquired from Glencore and that was now stored in Pacorini's Vlissingen warehouse. As intended, JPMorgan's warrant cancellations instantly created a large queue in Vlissingen—one that would grow to over 700 days.[17]

109. JPMorgan acquired $1.9 billion worth of primary aluminum either immediately before or as part of the swap. At the time, JPMorgan's primary aluminum holdings equated to more than half of the primary aluminum consumed in North America that year. According to the Senate Report, the $1.9 billion acquisition was so large that it caused JPMorgan to hold more

---

[17] *Detroit aluminum warrant cancellations said 'a revenue game,'* MetalBulleltin.com, https://www.metalbulletin.com/Article/2762432/AMM-Detroit-aluminum-warrant-cancellations-said-a-revenue.html (last visited June 23, 2016, 12:10 PM).

than 5% of its Tier 1 capital in physical commodities—in breach of the limits imposed by the Office of the Comptroller of Currency and the Federal Reserve.[18]

110.   The amount of primary aluminum warrants canceled were a direct result of Defendants' scheme to prevent the release of primary aluminum into the primary aluminum market, and far exceeded any legitimate need for primary aluminum. The surge in canceled warrants was a sea change in the LME system. Previously, canceled warrants represented a tiny percentage of total stocks and were tonnages destined for nearby consumer deliveries or, more likely, being readied to move to other warehouses under incentive schemes. With warehouses now under Defendants' control, Defendants started to make use of the restricted load-out spigot to cancel significant amounts of warrants in order to isolate consumers from spot LME warehouse primary aluminum and push regional premiums including the Midwest Premium higher than they would have been were it not for this anticompetitive conduct.  Defendants progressively canceled, or caused to be canceled, many more warrants than they needed for their spot commitments to give themselves places in the queue in each forward month for metal they owned and financed so that: (1) the premiums would continue to rise; and (2) at the end of each queue time period, they would have primary aluminum available for load-out to sell at illegally inflated premiums. Consumer customers who could not afford to finance a year's worth of primary aluminum were excluded from access to reasonably priced spot primary aluminum.

111.   Defendants manipulated the supply of primary aluminum by purchasing inventories of primary aluminum, placing them under warrant at the key LME warehouses, followed by dubious "transfers" to, in many cases, Defendants themselves or their affiliates, canceling the warrants based on such "transfers," and then reinstating the warrants once the

_____

[18] S.R. 379-384.

primary aluminum had reached the next warehouse.[19] Among other indicia of illegal market manipulation by Defendants is the fact that the amount of primary aluminum warrants they canceled far exceeded any legitimate need they may have had for primary aluminum. This misconduct diverted primary aluminum from actual primary aluminum users and created an artificial shortage of primary aluminum and thus, the higher Midwest Premium complained of herein. Defendant banks intended to, and did profit from the artificially inflated Midwest Premium by selling primary aluminum to customers like Reynolds and Southwire.

112.    In addition, Metro also gave JPMorgan preferential treatment in its warehousing queues, and in September 2010 loaded out primary aluminum owned by JPMorgan by moving its position in the queue ahead of primary aluminum warranted to other owners. This accommodation was not only against the interest of others in the queue, but apparently also against the interest of Metro itself. According to Metro's CFO, David Grupenhoff, the change cost Metro approximately $295,000 in lost rent (from JPMorgan) and offsetting payments to the warrant-holders who lost their place in the queue.

113.    On July 7, 2010, Sellars, the head of JPMorgan metals and Chairman of Henry Bath, emailed Wibbelman, Metro's CEO, about a loading out dispute at Metro's New Orleans location. Metro had refused to load trucks that missed their appointed time slots (prompting the JPMorgan trader to comment: "Metro talks about cooperation between our companies, but has a strange way of showing it."). Sellars then forwarded this email to Wibbelman confirming that he expected different treatment after a recent "brief chat" they previously had and proposed an upcoming dinner to discuss the "overall situation." Sellars then wrote: "As you are well aware

---

[19] David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

this is material sold to the fabrication industry by my traders . . . we do NOT take material for re-warehousing."

114.   Despite acquiring the Henry Bath warehouses, Sellars was emphatic to point out to Wibbelman that JPMorgan was "NOT" taking the primary aluminum to re-warehouse in its own facility. Instead, JPMorgan pointed out that it was selling the primary aluminum to fabricators, presumably at a price incorporating the artificially elevated Midwest Premium. Sellars concluded: "I don't really care what your rules are for anyone else . . . ." The upshot of this communication was that Sellars did not want Metro to retaliate, as it was not "destocking" Metro's warehouse; rather, it was selling its primary aluminum to fabricators.

115.   Later in October 2010, Wibbelman and a senior trader from Goldman's metals desk, Evans, discussed the possibility of Goldman/Metro acquiring primary aluminum from a Henry Bath warehouse. Wibbelman wrote: "I am concerned if this comes from a warehouse other than HB, since JPM and GS could set off a warehouse war between Metro and, say, Steinweg or CWT." Notably, Wibbelman was not concerned that taking metal out of Henry Bath would set off a warehouse war. Rather, Wibbelman was only concerned about the possibility of Goldman/Metro taking primary aluminum from a non-conspirator, such as Steinweg, who was a large independent warehousing company.

116.   Additionally, JPMorgan was storing primary aluminum it owned in warehouses owned by Metro, and paying the associated storage fees at "full retail" prices, despite the fact that JPMorgan actually owned its own warehousing subsidiary in Henry Bath. This conduct was at least against JPMorgan's own economic self-interest, and at most, a bold attempt to transfer funds to a firm it (through Henry Bath or directly with Goldman Sachs, which owns Metro) should have been competing with for the very service for which JPMorgan was paying.

38

**Defendants shuffle inventory between warehouses and work together to prevent primary aluminum from becoming available.**

117.     Although Defendants' perversion of the load-out rules would by themselves have been sufficient to create a backlog given Defendants' hoarding of primary aluminum and manipulation of the cancellation process, Defendants evaded even those minimal rules by shifting inventories of primary aluminum from one LME-certified warehouse to another (or to non-certified warehouses) so as to appear to comply with the load-out rules while actually maintaining their inventories, and the associated artificially-created queues.

118.     A *New York Times* article, which was based on an extensive investigation and contains quotes from individuals with direct knowledge of Metro's practices in Detroit, describes those practices:

> Each day, a fleet of trucks shuffles 1,500-pound bars of [aluminum] among the warehouses. Two or three times a day, sometimes more, the drivers make the same circuits. They load in one warehouse. They unload in another. And then they do it again.

119.     One former Metro forklift driver, Tyler Clay, described this process as a "merry-go-round of metal."[20] The result is that, despite the LME's load-out rules, "nearly all of the metal that Metro moves is not delivered to customers . . . . Instead, it is shuttled from one warehouse to another."[21]

120.     The Senate Report likewise noted that "some of the financial holding companies used or contemplated using physical commodity activities, such as…merry-go-round trades…that had the effect or potential effect of manipulating or influencing commodity

---

[20] David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

[21] *Id.*

22901902.1

prices."[22]   The Senate Report chronicled that Metro and Glencore had entered into a number of these transactions whereby Glencore agreed to cancel significant quantities of warrants for aluminum stored in Metro's Detroit warehouse.[23]   In exchange for lengthening Metro's queue, Metro guaranteed Glencore a specific future incentive payment to re-warrant the very same metal within Detroit Metro within a specified period of time. Metro fronted the logistical expense  (expenses that are usually borne by metal owners) involved to move the metal to a  new "off-warrant" Metro location, also in Detroit, where Glencore paid reduced rent. The aluminum was then scheduled to, and much of it did, come right back on-warrant within Detroit Metro. In the event Glencore ultimately did not re-warrant the aluminum as agreed (which it might do if, for example, the premium to sell the metal into the market had elevated significantly), then Glencore would pay to Metro a "break fee." The Senate Report found that Metro had been paid 29 such break fees between 2010 and 2014. Wibbelman acknowledged at the Senate hearing that Metro had never done a deal such as the merry-go-round deals prior to the time it was acquired by Goldman. Each merry-go-round deal was performed in consultation with, and permission of, Goldman. In all, Metro did at least six merry-go-round deals between 2010 and 2013.[24].

121.    This "merry-go-round" was not the result of ineptitude; rather, it was a strategy by Defendants to create longer wait times for the delivery of primary aluminum, thereby impacting the price of primary aluminum.

122.    In addition to shifting primary aluminum between LME-certified warehouses for no valid, lawful purpose, Defendants also moved primary aluminum, or caused it to be moved, to

---

[22] S.R. at 9-10.

[23] *Id.* at 202-04.

[24] *Id.* at 194-205.

non-LME warehouses they owned or controlled. According to the *Wall Street Journal*, as of October 2013, some 7 million to 10 million MT of primary aluminum were being housed in facilities known within the industry as "shadow warehouses."[25] The movement of primary aluminum from LME warehouses into shadow warehouses satisfied the LME's load-out requirements without ever releasing any primary aluminum into the market. This further restricted supply and drove up prices.

123. Defendants' shuffling of primary aluminum included deals with other parties, such as Deutsche Bank and Red Kite. In or around September 2010, Metro entered into an agreement with Deutsche Bank to move primary aluminum between Metro warehouses in Detroit. Metro paid Deutsche Bank an incentive fee to cancel 100,000 MT of primary aluminum, place it in the queue, and move it between Metro's Detroit warehouses only to eventually re-warrant the primary aluminum in Detroit. Metro entered into a similar deal with Red Kite in which Red Kite would eventually cancel over 500,000 MT of primary aluminum warrants. Metro performed the logistics of moving the primary aluminum to an off-LME warehouse storage site, only to guarantee Red Kite an incentive to re-warrant the primary aluminum (and charge it a "break fee" if it did not re-warrant the primary aluminum as agreed). Notably, the vast majority of this primary aluminum would simply be re-warranted in Detroit. On other occasions, Metro agreed with primary aluminum owners to store it at non-LME warehouses pursuant to the agreement that it would be "subject to" the Detroit queue, even though it was not warranted primary aluminum.

---

[25] Tatyana Shumsky, *Millions of Tons of Metals Stashed in Share Warehouses*, THE WALL STREET JOURNAL (December 23, 2013).

124.    There simply was no valid, procompetitive business justification for these machinations. Rather, their purpose and effect was to illegally increase the Midwest Premium by creating and maintaining artificially long queues in the relevant LME warehouses.

125.    Goldman recognized that the Midwest Premium started to rise when primary aluminum stopped flowing out of non-Detroit locations. In other words, when the only source for available primary aluminum was in Detroit, a person wanting that primary aluminum had to go through the queue. Given the length of the queue, it was not a viable option for a purchaser who needed spot primary aluminum from a warehouse to buy it from a seller with storehouses of it in Detroit. As a result, the Midwest Premium spiked up when it otherwise would not have increased, or at least not increased to the extent it did. Goldman specifically noted that "US Midwest premiums started to rise quickly in Mar 11 when Baltimore and Chicago (non-Metro locations) stopped flowing out. One can assume that most metal outside of Detroit has now been tied-up in financing deals."

126.    Defendants engaged in deals with each other to further tie up primary aluminum not already stored in Detroit. For example, in or around October 2011, JPMorgan and Metro entered into a rent deal concerning JPMorgan's primary aluminum stored at Metro's Mobile, Alabama location. On October 25, 2011, Metro's Wibbelman requested authority from Goldman's Jacques Gabillon and Greg Agran to approve a rent deal with JPMorgan. At the time, JPMorgan owned nearly all of Metro's 160,000+ MT of primary aluminum. JPMorgan had apparently been moving some of its primary aluminum to its Henry Bath location, but chose instead to enter a rent deal with Metro. This deal insured the primary aluminum would not be available to the market. It also furthered the improper, anticompetitive goal of keeping primary aluminum from being readily accessible to the spot market.

42

127.    As a further example of Defendants' anticompetitive conduct, JPMorgan kept its primary aluminum in a competitor's warehouse rather than move it to its own location in New Orleans or Baltimore, even though JPMorgan appears to have been the only company storing metal in Mobile. JPMorgan could have moved the primary aluminum to its own warehouse (and paid less rent) while at the same time preventing its warehouse competitor from collecting any rent from its Mobile operations. Instead, contrary to any valid, procompetitive business reason, JPMorgan stored over 150,000 MTs of primary aluminum with its competitors, which is about 7.5 percent of the U.S. annual domestic production – no small amount.

128.    During the times material to this Amended Complaint, Defendant Metro frequently dealt directly with Defendants Glencore and JPMorgan. These dealings included both the storage of primary aluminum owned by those Defendants at Metro warehouses as well as entering into sweetheart transactions designed to allow those Defendants to take primary aluminum from Metro warehouses without being subject to the Metro queues.

**Queues Rise Dramatically As The Amount Of Primary Aluminum Stored In LME Warehouses Soars.**

129.    From January through June 30, 2011 (mere months after Goldman's purchase of Metro), Metro warehouses in Detroit took in 364,175 MT of primary aluminum and delivered out 171,350 MT.[26] That represented 42 percent of inventory arrivals globally and 26 percent of the metal delivered out, according to LME data.[27] Before Goldman bought Metro, warehouse customers waited an average of six weeks for their purchases to be delivered to factories.[28] After

---

[26] Pratima Desai, et al., *Goldman's new money machine: warehouses*, Reuters (July 29, 2011).

[27] *Id.*

[28] David Kocieniewski, *A Shuffle of Aluminum, but to Banks, Pure Gold*, THE NEW YORK TIMES (July 20, 2013).

Goldman's acquisition of Metro, the wait skyrocketed, reaching a reported 674 days in March of 2014.[29]

130.    These same issues were reported in the Vlissingen, Netherlands warehouses (where Pacorini BV, owned by Glencore, is the dominant operator). Queues of about a year were reported for primary aluminum stored in Vlissingen. Glencore created those queues through a deliberate effort to hoard primary aluminum in those warehouses by payment of incentives for anticompetitive purposes.[30] As of December 2012, the Vlissingen LME warehouses stored more primary aluminum (1.44 million MT) than the LME Detroit warehouses (1.42 million MT).[31] As of March 31, 2014, the queue at Pacorini Vlissingen was reported as 610 days, as compared with 518 days on June 30, 2013.

131.    From the end of 2008 to around 2013, the amount of primary aluminum held in LME warehouses worldwide soared, from about 1.1 million MT in July 2008 to about 4.5 million MT in April 2013, a five-fold increase.

132.    In January 2008, there was less than 400,000 MT of primary aluminum stored in US LME warehouses. By January 2013, Metro's Detroit warehouses alone stored 1.4 million MT of primary aluminum.

**The Shortage Of Available Primary Aluminum Causes The Midwest Premium To Dramatically Rise.**

133.    The Midwest Premium fluctuated between four and eight cents per pound ($90-$180 per MT) during the period 2004 through 2008, which was characterized by robust primary

_____

[29] S.R. at 193.

[30] Maytaal Angel and Melanie Burton, *Glencore profits from metals backlog in Dutch port*, CHICAGO TRIBUNE (April 27, 2012).

[31] Agnieszka Troskiewicz, *Dutch Fishing Port Overtakes Detroit as Top Aluminum Location*, BLOOMBERG (Dec. 14, 2012).

44

aluminum consumption and LME Cash Prices which peaked at about $3,000 per MT. In the period between 2008 and 2010, during the financial crisis, recession, and subsequent tepid recovery, the Midwest Premium reflected downward market pressure and fluctuated between three to six cents per pound ($65-$130 per MT) at a time when the LME Cash Price was also much lower, fluctuating between $1,300-$2,200 per MT.

134.     Starting in February 2011, and due to Defendants' anticompetitive conduct, a markedly different pattern emerged. Economic conditions were still poor at this time and there was a huge global surplus of primary aluminum. Accordingly, the LME Cash Price began a decline from $2,600 to a low of $1,730. The Midwest Premium, however, moved in the opposite direction. Beginning in February 2011, the Midwest Premium spiked in three months from 6.45 cents to 8.94 cents per pound and then continued to rise during 2011 through 2013 to the then-current all-time record of 12 cents per pound ($265 per MT) in July 2013. In January 2014, the Midwest Premium surged to more than 20 cents per pound. The Midwest Premium was a little over 3 percent of the LME Cash Price at the height of the bull market in 2008, but eventually reached over 14 percent of the LME Cash Price – at a time when global surpluses of primary aluminum had never been higher.

135.     The chart below demonstrates how Defendants' conspiracy to withhold primary aluminum from the primary aluminum market caused the Midwest Premium to dramatically rise:

45



136.    The LME's Enforcement Committee commenced disciplinary proceedings against

Metro for activities that Metro undertook between September 2010 and April 2013.[32]

Specifically, Metro entered into transactions "with three different metal owners in respect of

metal stored at its Detroit LME warehouse location ("Metro LME Detroit"). The Transactions

concerned warrants relating to primary aluminum. The alleged breaches relate to Metro's

negotiation, structuring and undertaking of the Transactions. As part of these Transactions,

Metro offered inducements, which were accepted for certain metal stored in Metro LME Detroit

---

[32]

http://lme.com/~/media/files/notices/2016/07/16%20270%20a264%20w091%20disciplinary%20action%20-%20metro.pdf (last visited Oct. 13, 2016, 11:08 AM)

by the metal owners, who cancelled their warrants representing such metal. The cancelled metal was physically delivered out of Metro LME Detroit and then such metal or a portion of it was rewarranted at a later date in Metro LME Detroit."[33]

137.    LME permitted Metro to settle the disciplinary action for $10 million without admitting or denying the breaches. In imposing its sanction, the LME concluded that "the Transactions at Metro LME Detroit impacted the ability of the LME to perform its function effectively."[34] One of those functions—indeed the LME's most important function—it provides a "reference price for physical negotiations."[35] As explained above, and as confirmed by the LME imposing a substantial and unprecedented, Metro's conduct, in concert with co-Defendants, distorted and dislocated the price of primary aluminum paid by consumers.

## DEFENDANTS MANIPULATE THE MIDWEST PREMIUM AND REAP SUPRACOMPETITIVE PROFITS FROM SALES OF PRIMARY ALUMINUM.

### Defendants' trading operations involved the purchase and sale of primary aluminum.

138.    Defendant banks manipulated the primary aluminum price, including the Midwest Premium, so they could reap profits in their sales of primary aluminum, physical holdings, and trading activities.

139.    Defendants sell aluminum to industrial uses on both an annual and spot basis. Consistent with industry practice in the United States, Defendants charge the Midwest Premium. Defendant Glencore sold primary aluminum to industrial users in the United States and charged them the artificially inflated Midwest Premium. Glencore sold primary aluminum directly to Southwire and Reynolds that incorporated the artificially inflated Midwest Premium. Defendant

---

[33] *Id.*

[34] *Id.*

[35] https://www.lme.com/pricing-and-data/pricing/ (last visited 10/17/16 10:28 AM)

J. Aron sold primary aluminum to industrial users in the United States and charged them the artificially inflated Midwest Premium. J. Aron sold primary aluminum directly to Southwire that incorporated the artificially inflated Midwest Premium.

140.    Increasing the Midwest Premium allowed Defendants the opportunity and incentive to earn additional profits on these transactions because Defendants generally do not pay the Midwest Premium to acquire the aluminum.  Rather, they acquire through LME warrants or engaging in supply transactions with aluminum producers, which often involve their LME warehouse operations.  Defendants can sell aluminum in one of their warehouses without a queue, or even metal that is held off-warrant.  Thus, increases to the Midwest Premium allow Defendants to sell aluminum for more, providing them yet another motive to conspire.

141.    The artificial increases in the Midwest Premium also allowed Defendants to sell primary aluminum at additional profits by squeezing up the margin.  For example, if the markets were trending up, as Defendants knew they would by virtue of their anticompetitive conduct, they could buy physical metal in order to make markets in the premium and supply customers with that physical metal once Defendants obtained delivery of it.  Indeed, as traders of physical aluminum, the cornerstone of Defendants' business was to buy primary aluminum at a cheaper premium than the premium it sold at, including in sales to Southwire and Reynolds.

142.    Not only were Defendants able to profit on their sales of physical holdings, the mark to market value of these holdings also increased dramatically based on the increase in premium.  As the Senate Report noted, Goldman and JPMorgan had, or acquired, enormous physical holdings of primary aluminum during the period in question.[36] At the time Goldman acquired Metro in February 2010, it did not own any primary aluminum. By the end of 2012,

---

[36] S.R. at 3, 169, 318, 380-81.

Goldman's primary aluminum holdings exceeded 1.5 million MT, and were worth more than $3.2 billion. JPMorgan's primary aluminum holdings at the end of 2011 were valued at $6.5 billion. In January 2012, JPMorgan's inventory peaked at over 3.5 million MT, valued at almost $7.5 billion.

143.    The Defendant banks and traders also profited from trading activities related to artificially elevated premiums they had illegally created. When a commodities market is in contango (when the futures price is higher than the expected spot price), a holder of the commodity has an opportunity for profit if storage and financing costs for holding the commodity are less than the difference between the expected spot price and the futures price. Where, as here, the same or related parties could simultaneously: (1) hold; (2) store; and (3) finance the commodity, there was a ripe opportunity for primary aluminum market manipulation and collusion at the expense of bona fide purchasers of primary aluminum. Defendants' use of incentives for storage of primary aluminum in their warehouses also encouraged such manipulation by lowering carrying costs. As the Senate Report noted, "[i]f the bank's affiliate owns a metals warehouse and the bank trades metals in the futures market, the bank may time the release of the warehoused metal in ways that benefit the bank's own commodities positions and contrary to the interests of its clients."[37]

144.    The trading arms of the bank Defendants, along with Glencore's trading operation, engaged in futures transactions in the LME forward contract market. As discussed above, these traders and banks seized the opportunity to purchase primary aluminum during the times material to this Amended Complaint and sold it forward for a future profit, due to the prevailing market contango. In order to take the future short (selling) position in the LME

_____

[37] S.R. at 37.

market, there must be corresponding long (buying) positions. Many of these long positions reflect industrial users of primary aluminum who know that they will need a quantity of primary aluminum on future dates but seek price protection against inflation of the LME Cash Price. By contrast, these industrial users had no protection against the artificial inflation of the Midwest Premium.[38]

145.    The increase in the Midwest Premium and other regional premiums was borne by purchasers of primary aluminum, and was the result of Defendants' anticompetitive conduct. For a long time, although primary aluminum purchasers could hedge against the LME Cash Price, no major financial institution offered a hedge against rising regional premiums (including the Midwest Premium) – even though, as explained before, Goldman Sachs and JPMorgan (among other major investment banks) were active participants in the market for commodities-related derivative instruments. The uniformity and depth of the antitrust injury inflicted on Plaintiffs by Defendants' conduct is amply illustrated by the fact that during almost the entire period of time material to this Amended Complaint, primary aluminum purchasers could not obtain hedge or similar risk management protection against rising Midwest Premium levels.

**Defendants Sell Their Warehouse Businesses Upon Investigatory Scrutiny.**

146.    As a result of the conduct set forth above, large purchasers of primary aluminum made formal complaints to the LME and other authorities.

---

[38] Defendant warehouses also benefited from the existence of queues in the system by being able to charge higher rents. LME warehouses generally earn revenue in two ways. First, warehouses earn rent for each day they store metal within their warehouse. Second, warehouses charge Free on Truck ("FoT") rates, which are essentially delivery-out charges relating to the release of the metal from their warehouse. Warehouses set their maximum daily rent and FoT rates on an annual basis. The annual period runs from April 1 to March 31. Warehouses must submit their rents and FoT rates to the LME by December 1 of the preceding year. The LME then publishes this information. Each warehouse thus knows its competitors' annual maximum daily rent and FoT rates. Warehouses with queues are incentivized to publish higher rents and FoT rates, because the existence of a queue guarantees metal must be stored for a minimum amount of time. In contrast, warehouses without queues should be incentivized to publish lower rents and FoT rates in order to attract metal. Nevertheless, the rents for all three Defendant warehouses largely moved in lockstep.

147.    For example, Coca Cola filed a complaint with the LME in June 2011, accusing Goldman Sachs of creating supply bottlenecks at the Detroit warehouses to artificially raise the price of primary aluminum. In that complaint, Coca Cola stated that it takes more than seven months to access primary aluminum from the Detroit warehouses.[39]

148.    Subsequently, the Beer Institute, a trade group representing beer brewers, filed another complaint with the LME. According to a statement released by the Beer Institute in conjunction with the complaint, Defendants' rules and practices "are interfering with normal supply and demand dynamics" and have "led to a complete disconnect between LME aluminum prices and actual primary aluminum prices and prevent brewers and their suppliers from obtaining primary aluminum in a reasonable timeframe at fair-market prices."[40]

149.    Defendants' conduct also sparked government investigations, both domestically and abroad. In May 2011, the Science and Technology Committee of the House of Commons of the Parliament of the United Kingdom reported a concern that "the ownership of metals storage warehouses by a dominant dealer on the London Metals Exchange" (apparently referring to JPMorgan) may be anticompetitive and referred this concern to the Office of Fair Trading.[41]

150.    In November 2014, the U.S. Senate Permanent Subcommittee on Investigations released the Senate Report on its probe into potential abuses in energy and metals markets, including looking into Defendants' involvement with the aluminum markets.[42] The report noted

---

[39]    Dustin Walsh, *Aluminum Bottleneck: Coke's complaint: 12 percent of global stockpile held here, boosting prices*, CRAIN'S DETROIT BUSINESS (June 26, 2011).

[40]    Joe Richter and Agnieszka Troskiewicz, Beer Companies Press LME to Cut Aluminum Warehouse Backlogs, BLOOMBERG (June 23, 2013).

[41]    United Kingdom Parliament, House of Commons Science and Technology Committee, "*Fifth Report: Strategically important metals*," ¶¶79-81 (May 2011). Available at: http://www.publications.parliament.uk/pa/cm201012/cmselect/cmsctech/726/72602.htm.

[42]    S.R. at 169.

that the fact that Goldman "engaged in extensive aluminum trading at the same time it was approving practices leading to a long warehouse queue has given rise to serious doubts about the integrity of the  aluminum market."[43]

151.    To the extent they have wound down this collusive restriction of the available primary aluminum on the market, the collusive group was able to lock in their profits by exiting together before most of the other holders of metal in the warehouses, leaving these slower market participants to take the comparative loss, while the collusive group gained.

152.    As a result of increased industry, media, and regulatory scrutiny, many of the Defendants changed their practices or exited the warehousing business altogether.

153.    In March of 2014, JPMorgan sold its physical commodities trading business, which included its primary aluminum warehousing.[44]

154.    Goldman soon followed suit. On July 31, 2013, Goldman Sachs announced several steps to reduce load-out times at the Metro Detroit warehouses, including offering purchasers immediate delivery and prioritizing purchasers who actually intended to use the primary aluminum over traders and speculators in the queues. Goldman's commitment to changing its business practices, however, was short lived. By August of 2015, Goldman was completely out of the primary aluminum warehousing business.[45]

155.    Most importantly, only a few months after it came under new ownership that was independent of the other Defendants, the LME announced aggressive new initiatives to reduce queues, including proposing the simple step of requiring those warehouses experiencing

---

[43] *Id.*

[44] *See* Dmitry Zhdannikov and Chris Peters, *JPMorgan sells physical commodities until to Merduria for $3.5 billion*, REUTERS (Mar. 19, 2014).

[45] *See* Josephine Mason, *Exclusive: Goldman puts Metro metals warehousing unit up for sale*, REUTERS (May 20, 2014).

excessive queues to load out more primary aluminum than they load in.[46] There is no legitimate reason why this obvious action could not have been taken when the complaints about the excessive queues first surfaced.

**PLAINTIFFS SUFFERED INJURY RESULTING FROM DEFENDANTS' CONSPIRACY.**

156.    Defendants' collusion and manipulation, as alleged above, affected the pricing of millions of dollars' worth of aluminum in the United States and other parts of the world.

157.    Plaintiffs have suffered antitrust injury due to Defendants' misconduct alleged above in the form of having to pay an illegally and artificially inflated Midwest Premium. Absent Defendants' misconduct, the Midwest Premium Plaintiffs paid would have remained stable or, more likely, decreased in conjunction with the base price, thus resulting in lower net prices for Plaintiffs. Instead, during the relevant time period of Defendants' misconduct, the Midwest Premium soared to record levels.

158.    Plaintiffs are efficient enforcers of the antitrust laws in that by paying artificially inflated aluminum prices directly to integrated producers and traders, including directly to Defendants Glencore and J. Aron, Plaintiffs have suffered the most direct injury. As the direct and first-level purchasers of primary aluminum, and for their own industrial uses, Plaintiffs are the first payers of the inflated regional premiums, directly injured by inflated aluminum prices, and so are among the class of persons whose self-interest would motivate them to vindicate the public interest in antitrust enforcement.

159.    Plaintiffs remain the most efficient enforcer even compared to the producers because the producers' self-interest would not motivate them to file suit to enforce the antitrust

---

[46] *Goldman sells Colombia coal unit, ending physical commodity forays,* CNBC.com, http://www.cnbc.com/2015/08/14/goldman-sells-colombia-coal-unit-ending-physical-commodity-forays.html (last visited June 23, 2016, 12:45 PM).

laws and the producers do not pay the premiums. Plaintiffs' injuries are concrete and not speculative, being tied directly to the artificially-inflated Midwest Premium. Finally, as the direct purchasers of primary aluminum for their own use, there is no difficulty identifying or apportioning Plaintiffs' damages in this action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

160.    Plaintiffs reallege and reincorporate by reference the preceding allegations as if fully set forth herein.

161.    Beginning at a time unknown to Plaintiffs, but reasonably believed to be at or around the time of Goldman's acquisition of Metro in 2010 and continuing through the present, Defendants and their co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

162.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of primary aluminum for physical delivery by imposing supra-competitive regional premiums, including the Midwest Premium. Defendants' conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

163.    Defendants' conspiracy, and the resulting impact on the market for primary aluminum, occurred in and affected interstate commerce. Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

164.    The contract, combination or conspiracy has had the following effects, among others: (1) Prices charged to Plaintiffs for purchases of primary aluminum, particularly the regional premiums, including the Midwest Premium and other regional premium price terms, were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and (2) Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the market for primary aluminum.

165.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

166.    Plaintiffs are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Sherman Act alleged herein.

<strong>SECOND CLAIM FOR RELIEF<br>VIOLATION OF THE NEW YORK DONNELLY ACT</strong>

167.    To the extent not inconsistent with this Second Claim for Relief, Plaintiffs reallege and reincorporate by reference the preceding allegations as if fully set forth herein.

168.    Beginning at a time unknown to Plaintiffs, but reasonably believed to be at or around the time of Goldman's acquisition of Metro and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, agreement, arrangement or combination whereby competition or the free exercise of activity in the conduct of business, trade, or commerce in the state of New York is or has been restrained, in violation of the Donnelly Act (N.Y. G.B.L. § 340, et seq.).

169.    The contract, agreement, arrangement, or combination consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of

primary aluminum for physical delivery by imposing supra-competitive regional premiums, including the Midwest Premium.

170.    Defendants' contract, agreement, arrangement or combination, and the resulting impact on the market for primary aluminum, occurred in and affected commerce in the state of New York.

171.    Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

172.    The contract, agreement, arrangement or combination has had the following effects, among others: (1) Prices charged to Plaintiffs for purchases of primary aluminum, particularly regional premiums, including the Midwest Premium and other regional price terms, were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and (2) Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the market for primary aluminum.

173.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

174.    Pursuant to N.Y. G.B.L. §340(5), Plaintiffs are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of law alleged herein.

**THIRD CLAIM FOR RELIEF**
**<u>VIOLATION OF THE MICHIGAN ANTITRUST REFORMATION ACT</u>**

175.    To the extent not inconsistent with this Third Claim for Relief, Plaintiffs reallege and reincorporate by reference the preceding allegations as if fully set forth herein.

176.    Beginning at a time unknown to Plaintiffs, but reasonably believed to be at or around the time of Goldman's acquisition of Metro, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a conspiracy to restrain trade in violation of the Michigan Antitrust Reformation Act (MCL § 445.772, et seq.).

177.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of primary aluminum for physical delivery by imposing supra-competitive regional premiums, including the Midwest Premium.

178.    Defendants' conspiracy, and the resulting impact on the market for primary aluminum, occurred in and affected commerce in the state of Michigan, including Plaintiffs' purchases of primary aluminum. Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

179.    The contract, combination, or conspiracy has had the following effects, among others: (1) Prices given to Plaintiffs for purchases of primary aluminum, particularly the regional premiums, including the Midwest Premium price term, were fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and (2) Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the market for primary aluminum.

180.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

181.     As a result of Defendants' violation of MCL § 445.772, Plaintiffs are entitled to treble damages, costs and reasonable attorneys' fees pursuant to MCL § 445.778.

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE ILLINOIS ANTITRUST ACT
### (Brought by Reynolds Only)

182.     To the extent not inconsistent with this Fourth Claim for Relief, Plaintiff Reynolds realleges and reincorporates by reference the preceding allegations as if fully set forth herein.

183.     Beginning at a time unknown to Reynolds, but reasonably believed to be at or around the time of Goldman's acquisition of Metro, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a conspiracy to restrain trade in violation of the Illinois Antitrust Act (740 ILCS 10/3).

184.     The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants artificially raised prices for purchases of primary aluminum for physical delivery by imposing supra-competitive regional premiums, including the Midwest Premium.

185.     Defendants' conspiracy, and the resulting impact on the market for primary aluminum, occurred in and affected commerce in the state of Illinois, including Reynolds' purchases of primary aluminum. Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

186.     The contract, combination, or conspiracy has had the following effects, among others: (1) Prices given to Reynolds for purchases of primary aluminum, particularly the regional

premiums, including the Midwest Premium price term, were fixed or stabilized at levels higher

than the free market would have returned but for the manipulation; and (2) Reynolds has been

deprived of the benefits of free, open, and unrestricted competition in the market for primary

aluminum.

187.    As a proximate result of Defendants' unlawful conduct, Reynolds has suffered

injury to its business or property.

188.    As a result of Defendants' violation of 740 ILCS 10/3, Reynolds is entitled to

treble damages, costs and reasonable attorneys' fees pursuant to 740 ILCS 10/7.

**FIFTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Brought by Reynolds Only)**

189.    To the extent not inconsistent with this Fifth Claim for relief, Plaintiff Reynolds

realleges and reincorporates by reference the preceding allegations as if fully set forth herein.

190.    In the alternative or in addition to the foregoing claims, Reynolds is entitled to

recovery under Illinois state law for unjust enrichment.

191.    Defendants have unjustly retained benefits received, to the detriment of Reynolds.

Defendants' unjust enrichment includes, but is not limited to, profits received by them as a result

of their wrongful actions which caused Reynolds to pay inflated prices for primary aluminum

purchases.

192.    As a direct result of Defendants' unjust enrichment, Reynolds has suffered an

impoverishment and has been injured in its business or property.

193.    In the event Reynolds does not fully prevail on its other claims, no adequate

remedy exists at law to allow Reynolds to seek restitution for its injuries.

194.    No justification exists for the Defendants receipt or retention of the unjust

enrichment they have received as a result of their wrongful actions which directly injured

59

Reynolds. Therefore, Reynolds is entitled to disgorgement of all profits resulting from the payment of inflated fees and prices for primary aluminum.

### SIXTH CLAIM FOR RELIEF
### VIOLATION OF The GEORGIA FAIR BUSINESS PRACTICES ACT
#### (Brought by Southwire Only)

195.    To the extent not inconsistent with this Sixth Claim for Relief, Plaintiff Southwire realleges and reincorporates by reference the preceding allegations as if fully set forth herein.

196.    Beginning at a time unknown to Southwire, but reasonably believed to be at or around the time of Goldman's acquisition of Metro, and continuing through the present, Defendants and their co-conspirators engaged in unfair and deceptive practices in their conduct of consumer transactions, in violation of the Georgia Fair Business Practices Act, (Ga. Code Ann. §10-1-393).

197.    The unfair and deceptive practices committed between and among Defendants and their co-conspirators, were done in furtherance of a conspiracy to artificially raise prices for purchases of primary aluminum for physical delivery by imposing supra-competitive regional premiums, including the Midwest Premium.

198.    Defendants' actions, and the resulting impact on the market for primary aluminum, occurred in and affected commerce in the state of Georgia, including Southwire's purchases of primary aluminum. Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

199.    The Defendants' unfair and deceptive practices in trade and commerce had the following effects, among others: (1) Prices given to Southwire for purchases of primary aluminum, particularly the regional premiums, including the Midwest Premium price term, were

60

fixed or stabilized at levels higher than the free market would have returned but for the manipulation; and (2) Southwire has been deprived of the benefits of free, open, and unrestricted competition in the market for primary aluminum.

200.    Prices given to Southwire and other consumers for purchases of primary aluminum, particularly including the Midwest Premium price term, were fixed or stabilized at levels higher than the free market would have returned but for Defendants' price manipulation.

201.    Southwire has been deprived of the benefits of free, open, and unrestricted competition in the market for primary aluminum.

202.    As a proximate result of Defendants' unlawful conduct, Southwire has suffered injury to its business or property.

203.    As a result of Defendants' violation of Ga. Code Ann. §10-1-393, Southwire is entitled to treble damages, costs and reasonable attorneys' fees pursuant to §10-1-390, et. seq.

**SEVENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Brought by Southwire Only)**

204.    To the extent not inconsistent with this Seventh Claim for Relief, Plaintiff Southwire realleges and reincorporates by reference the preceding allegations as if fully set forth herein.

205.    In the alternative or in addition to the foregoing claims, Plaintiff Southwire is entitled to recovery under Georgia State law for unjust enrichment.

206.    Defendants have received an identifiable benefit, namely, increased profits resulting from Defendants' unlawful actions which caused Southwire to pay inflated prices and costs for primary aluminum purchases.

207.    Receipt of the benefit came at no costs to Defendants, rather, it was a result of their unlawful conduct.

61

208.    In the event Southwire does not fully prevail on its other claims, no adequate

remedy exists at law to allow Southwire to seek restitution for its injuries.

209.    No justification exists for the Defendants' retention of the unjust enrichment they

have received as a result of their wrongful actions which directly injured Southwire. Therefore,

Southwire is entitled to disgorgement of all profits resulting from the payment of inflated fees

and prices for primary aluminum.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

(a)    Enter an order declaring that Defendants' actions as set forth in this Amended
       Complaint, and in other respects, violate the law;

(b)    Award Plaintiffs damages in an amount according to proof against Defendants for
       Defendants' violation of 15 U.S.C. § 1, to be trebled in accordance with those
       laws;

(c)    Award Plaintiffs damages in an amount according to proof against Defendants for
       Defendants' violation of N.Y. G.B.L. § 340, et seq., to be trebled in accordance
       with those laws;

(d)    Award Plaintiffs damages in an amount according to proof against Defendants for
       Defendants' violation of M.C.L. § 445.772, et seq., to be trebled in accordance
       with those laws;

(e)    Award Plaintiff Reynolds damages in an amount according to proof against
       Defendants for Defendants' violations of 740 ILCS 10/3, to be trebled in
       accordance with those laws;

(f)    Award Plaintiff Reynolds damages in an amount according to proof against
       Defendants for Defendants' unjust enrichment in violation of Illinois state law;

(g)    Award Plaintiff Southwire damages in an amount according to proof against
       Defendants for Defendants' violations of the Georgia Fair Business Practices Act,
       Ga. Code Ann. § 10-1-393, to be trebled in accordance with those laws;

(h)    Award Plaintiff Southwire damages in an amount according to proof against
       Defendants for Defendants' unjust enrichment in violation of Georgia state law;

(i)    Award Plaintiffs their costs of suit, including reasonable attorneys' fees and
       expenses; and

(j)    Award such other equitable and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs respectfully demand a trial by jury of all issues so triable.

Dated: October 19, 2016

Respectfully submitted,

LOUIS F. BURKE, P.C.

By: /s/
Louis F. Burke, Esq.
Leslie Wybiral, Esq.
460 Park Avenue, 21ST Floor
New York, NY 10022
Tel:  (212) 682-1700
Fax:  (212) 808-4280
lburke@lfblaw.com
lwybiral@lfblaw.com

*Attorneys for Plaintiffs*

HONIGMAN MILLER SCHWARTZ AND COHN LLP

Robert J. Palmersheim, Esq.
David E. Koropp, Esq.
Anand C. Mathew, Esq.
Matthew G. Mrkonic
One South Wacker Drive, 28th Floor
Chicago, IL 60606
Tel: (312) 701-9339
Fax: (312) 701-9335
RPalmersheim@honigman.com
DKoropp@honigman.com
AMathew@honigman.com
MMrkonic@honigman.com

*Attorneys for Plaintiffs*
*Admitted Pro Hac Vice*

22901902.1