**COVINGTON**

BEIJING   BRUSSELS   LONDON   LOS ANGELES
NEW YORK   SAN FRANCISCO   SEOUL
SHANGHAI   SILICON VALLEY   WASHINGTON

Robert D. Wick

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 5487
rwick@cov.com

**By Electronic Case Filing**                                                  November 19, 2021

Honorable Paul A. Engelmayer
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square, Room 1305
New York, NY 10007

> Re:   *In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-2481;
>         *Reynolds Consumer Products LLC v. Glencore AG*, No. 16-cv-5955

Dear Judge Engelmayer:

    I write on behalf of all Defendants pursuant to this Court's Individual Rules Section 3.H and the scheduling order (ECF No. 1344) regarding the grounds for Defendants' anticipated motion for summary judgment.

## I.   Defendants Did Not Conspire to Restrain the Supply of Aluminum.

    Defendants' summary judgment motion will argue that there is insufficient evidence from which a reasonable jury could infer an antitrust conspiracy.  *See, e.g.*, *Anderson News, LLC v. Am. Media, Inc.*, 899 F.3d 87, 97 (2d Cir. 2018).

    Plaintiffs allege that three trading firms and their warehouse affiliates conspired to hoard aluminum in order to restrict supply and drive up all-in aluminum prices.  Neither Plaintiffs nor their expert, however, have ever articulated the scope or contours of the purported conspiratorial agreement.  Instead, Plaintiffs essentially (i) point to a grab-bag of disparate and divergent conduct by different Defendants at different times, and then (ii) vaguely assert that all of this seemingly unrelated conduct was united by some sort of overarching agreement among Defendants to "do those things that they agreed to do" to carry out the purported scheme. Plaintiffs are notably silent as to what each Defendant allegedly promised to do in support of the purported scheme, what promises Defendants allegedly received from other conspirators in exchange for their purported commitments, or how any given conspirator could determine whether its co-conspirators were honoring their commitments under the alleged agreement.

    This Court should grant summary judgment against Plaintiffs' ill-defined conspiracy claim for at least four reasons.

    *First*, the alleged conspiracy is economically implausible.  Plaintiffs accuse Defendants of investing huge sums of money in a precarious scheme to (i) buy up enough aluminum to raise prices and then (ii) sell off enough aluminum at inflated prices to recoup their huge investments

COVINGTON

Honorable Paul A. Engelmayer
November 19, 2021
Page 2

before prices returned to competitive levels. Any such scheme would be risky under the best of circumstances, but here, Plaintiffs assert that Defendants conspired to hoard aluminum in the midst of the largest aluminum surplus that the world has ever seen, and did so *without* the cooperation of the aluminum smelters that account for the vast majority of the global aluminum supply. Plaintiffs have not demonstrated the economic rationality of such a scheme.

*Second*, all of the alleged conduct was "at least as—if not more—consistent with legitimate business concerns as with unlawful conspiracy." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 241 (2d Cir. 1999). Plaintiffs fail to identify any direct evidence of a conspiratorial agreement to hoard aluminum or restrict supply. Nor have they identified any parallel conduct or other circumstantial evidence suggestive of such a conspiracy. Although Plaintiffs allege that there is something suspicious about Defendants' large aluminum holdings, it was unilaterally rational and profitable for Defendants to buy and store aluminum given their low storage and financing costs and the contango conditions in the market. Similarly, although Plaintiffs challenge the emergence of long aluminum queues at LME warehouses in Detroit and Vlissingen, those queues were the natural and predictable result of the global aluminum surplus and the economic incentives created by the applicable LME load-out rules. Moreover, none of the disparate conduct relied on by Plaintiffs was unique to Defendants. To the contrary, each of the practices challenged by Plaintiffs was engaged in by multiple non-Defendants.

*Third*, Plaintiffs lack any evidence indicating that any of the three sets of Defendants participated in the alleged conspiracy.

a. <u>JPMorgan and Henry Bath</u>. JPMorgan and Henry Bath never had significant queues at any of their warehouses, never participated in a so-called "merry-go-round" deal, never moved any aluminum *into* Metro Detroit or Pacorini Vlissingen and instead moved aluminum *out of* those warehouses, and never paid large incentives to attract aluminum into their warehouses. In fact, JPMorgan and Henry Bath engaged in conduct antithetical to the alleged conspiracy by aggressively lobbying the LME to crack down on mega-warehouses with lengthy queues. Plaintiffs' allegations against JPMorgan focus almost entirely on a single large swap transaction between JPMorgan and Glencore in December 2011, but that transaction was simply an arms-length commercial deal that was rational and profitable on its own merits.

b. <u>Goldman and Metro</u>. Goldman and Metro engaged in unilaterally rational behavior given the market circumstances. Plaintiffs' allegations against Goldman and Metro focus on the emergence of the Metro Detroit queue, but Metro had attracted large stocks of aluminum *before* Goldman acquired it and before the alleged conspiracy began. Those large stocks, in turn, permitted Metro profitably to pay incentives to attract additional aluminum, out-competing other LME warehouses and resulting in Metro Detroit's large inventory of aluminum. Plaintiffs also challenge what they refer to as "merry-go-round" transactions, but those re-warranting deals were unilateral attempts by Metro to compete for metal that otherwise might have moved to other warehouses, and Goldman never participated in such a transaction.

c. <u>Glencore and Pacorini</u>. Far from "hoarding" aluminum, Glencore consistently sold large volumes of aluminum to customers such as Reynolds throughout the relevant period. As the world's largest aluminum trader, Glencore purchased and sold aluminum at market prices during those years. Although Plaintiffs point to the lengthy queue that developed at Pacorini's

COVINGTON

Honorable Paul A. Engelmayer
November 19, 2021
Page 3

Vlissingen warehouse, the Vlissingen queue arose from Glencore's *unilateral* decision to purchase a large amount of aluminum from Rusal, store that aluminum in Pacorini Vlissingen, and then use warrants for that aluminum to settle a large expiring LME short position. A queue in Vlissingen was inevitable once Glencore decided to give up ownership of those warrants.

*Fourth*, as Plaintiffs' expert admitted at his deposition, no individual element of the alleged conspiracy could have raised all-in aluminum prices on its own, which means that no individual element standing alone could have resulted in anticompetitive effects or antitrust injury. Accordingly, Plaintiffs bear the burden of establishing that each and every aspect of the challenged conduct was part of a single overarching conspiracy to restrain the global supply of aluminum. The evidence in the record falls far short of meeting that burden.[1]

## II. Southwire Lacks Efficient-Enforcer Standing to Assert Most of Its Claims.

Over 80 percent of Southwire's total damages claims are based on purchases from non-Defendants. Southwire therefore lacks "efficient enforcer" standing to assert those claims for the same reasons that this Court granted summary judgment against the FLPs and IPs, *see* ECF No. 1320, and in some instances also is an indirect purchaser whose claims are barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Southwire argues that many of its purchases were made from Century, a smelter in which Glencore held a large minority ownership stake, but there is no evidence that Century participated in the alleged conspiracy, and Glencore's minority ownership makes no difference under the efficient enforcer factors. Southwire's claims based on purchases from non-Defendants therefore should be dismissed.

## III. Plaintiffs Lack Admissible Evidence of Injury and Damages.

Plaintiffs lack admissible evidence of either injury or damages. Plaintiffs rely wholly on expert testimony from Dr. James Burrows to establish these elements of their claims, but his testimony is unreliable under *Daubert* and Federal Rule of Evidence 703. *See Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002).

Dr. Burrows's opinions are inadmissible for at least three reasons. *First*, Dr. Burrows fails to isolate the effects of Defendants' conduct and instead attributes *all* market imperfections to the alleged conspiracy, contrary to *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). *Second*, Dr. Burrows's model of aluminum prices in the "but-for world" is economically and statistically invalid. The model is not based on real-world data, fails to account for critical factors influencing prices, and predicts damages when none could exist. *Third*, Dr. Burrows's model uses unreliable methods and inputs. Correcting even one of Dr. Burrows's flawed assumptions largely or entirely eliminates damages.

---

[1] Plaintiffs' state-law claims likewise fail because Plaintiffs cannot establish that Defendants entered into an illegal conspiracy. Plaintiffs' state-law claims also fail for additional reasons including lack of standing, choice of law, and Plaintiffs' inability to prove the elements of each state-law claim.

**COVINGTON**

Honorable Paul A. Engelmayer
November 19, 2021
Page 4

                                    Respectfully submitted,

                                    *s/ Robert D. Wick*
                                    Robert D. Wick

                                    *Counsel to the JPMorgan Defendants*

cc:      All Counsel—by ECF